# 24-1137

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

◆❖◆

TERI WOODS PUBLISHING, LLC,

*Plaintiff-Appellant,*

—against—

AMAZON.COM, INC., AUDIBLE, INC.,
BLACKSTONE AUDIO, INC., URBAN AUDIO BOOKS, LLC,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

## BRIEF FOR PLAINTIFF-APPELLANT

BRUCE R. EWING
DANIEL P. GOLDBERGER
DORSEY & WHITNEY LLP
51 West 52nd Street
New York, New York 10019
(212) 415-9200

*Attorneys for Plaintiff-Appellant
Teri Woods Publishing, LLC*

## CORPORATE DISCLOSURE STATEMENT

In compliance with Federal Rule of Appellate Procedure 26.1, plaintiff-appellant Teri Woods Publishing, LLC states that it has no parent corporations, and that there is no publicly held corporation that owns 10% or more of its stock.

Dated: June 20, 2024

/s/ *Bruce R. Ewing*
Bruce R. Ewing

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF AUTHORITIES ...................................................................iv

PRELIMINARY STATEMENT ...........................................................1

JURISDICTIONAL STATEMENT ........................................................4

ISSUES PRESENTED..........................................................................5

STATEMENT OF THE CASE................................................................6

    A.    Teri Woods and TWP ..............................................................6

    B.    The License Agreement ............................................................7

    C.    UAB Exceeds the Scope of the Rights Granted in the License
        Agreement ...............................................................................9

    D.    TWP Asks for Information Concerning the Distribution of Its
        Works and Receives Vague or Bellicose Responses .........................13

    E.    TWP Notifies Appellees of Their Infringement, Terminates the
        License Agreement, and This Lawsuit Follows................................16

SUMMARY OF ARGUMENT ..............................................................17

STANDARD OF REVIEW ...................................................................21

ARGUMENT ......................................................................................21

    THE DISTRICT COURT MADE THREE FUNDAMENTAL ERRORS
    IN CONSTRUING THE LICENSE AGREEMENT AS A MATTER
    OF LAW AND DISMISSING TWP'S COPYRIGHT INFRINGEMENT
    CLAIMS ...............................................................................21

        A.    The License Agreement Did Not Permit "Free"
            Distribution of the TWP Works................................26

ii

B.    The License Agreement Did Not Grant Appellees the Right to Distribute the TWP Works in Ways That Deprived  TWP of the Per-Copy "Royalties" to Which It Was Entitled ....................................................................... 31

C.    The District Court Ignored Relevant Contractual Provisions in Construing the License Agreement to Permit Listeners to Access Excerpts of the TWP Works at No Charge ........................................................................... 42

D.    Upon Reversal of the Decision Below Dismissing TWP's Direct Copyright Infringement Claims Against Appellees, Its Secondary Infringement Claims, as Well as Its Common Law Claims Against UAB, Should Be Reinstated ................................................................................ 46

CONCLUSION ....................................................................................... 48

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*Alex Is the Best LLC v. Blu Prods., Inc.*,
Civ. Act. No. 16-769-RGA, 2017 U.S. Dist. LEXIS182313 (D.
Del. Nov. 3, 2017) ...............................................................................41

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
493 F.3d 87 (2d Cir. 2007) ................................................................21

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)............................................................................21

*Blue Tree Hotels Inv. (Canada), Ltd. v. Starwood Hotels & Resorts
Worldwide, Inc.*,
369 F.3d 212 (2d Cir. 2004) ...............................................................36

*Bourne v. Walt Disney Co.*,
68 F.3d 621 (2d Cir. 1995) .................................................................23

*Chapman v. N.Y. State Div. for Youth*,
546 F.3d 230 (2d Cir. 2008) .........................................................24, 30

*Cromwell Towers Redevelopment Co. v. City of Yonkers*,
41 N.Y.2d 1, 390 N.Y.S.2d 822, 359 N.E.2d 333 (1976) ..................30

*Curry v. City of Syracuse*,
316 F.3d 324 (2d Cir. 2003) ...............................................................47

*Davis v. Blige*,
505 F.3d 90 (2d Cir. 2007) .................................................................22

*Farrell Lines, Inc. v. City of New York*,
30 N.Y.2d 76, 330 N.Y.S.2d 358, 281 N.E.2d 162 (1972) ................30

*Gary Friedrich Enters., LLC v. Marvel Characters, Inc.*,
716 F.3d 302 (2d Cir. 2013) ...............................................................24

*Gelboim v. Bank of Am. Corp.*,
823 F.3d 759 (2d Cir. 2016) ...............................................................21

iv

*Gerrard v. Acara Sols. Inc.*,
  Case No. 18-CV-1041V(F), 2019 WL 2647758 (W.D.N.Y. Jun.
  27, 2019), ), *report and recommendation rejected on other
  grounds*, 469 F. Supp. 3d 96 (W.D.N.Y. 2020)................................41

*Gilliam v. ABC*,
  538 F.2d 14 (2d Cir. 1976) ..............................................................23

*Goodheart Clothing Co. v. Laura Goodman Enters.*,
  962 F.2d 268 (2d Cir. 1992) ............................................................45

*Graham v. James*,
  144 F.3d 229 (2d Cir. 1998) ............................................................22

*Greenwich Capital Fin. Prods., Inc. v. Negrin*,
  74 A.D.3d 413, 903 N.Y.S.2d 346 (1st Dep't 2010) .......................45

*Hall v. Sargeant*,
  Case No. 9:18-CV-80748, 2019 U.S. Dist. LEXIS 50316 (S.D. Fl.
  Mar. 26, 2019)..................................................................................41

*Harris v. Simon & Schuster, Inc.*,
  646 F. Supp. 2d 622 (S.D.N.Y. 2009) .............................................23

*Int'l Klafter Co. v. Cont'l Cas. Co.*,
  869 F.2d 96 (2d Cir. 1989) ..............................................................31

*Int'l Multifoods Corp. v. Commercial Union Ins. Co.*,
  309 F.3d 76 (2d Cir. 2002) ..............................................................29

*Island Software & Computer Serv. v. Microsoft Corp.*,
  413 F.3d 257 (2d Cir. 2005) ......................................................22, 36

*JA Apparel Corp. v. Abboud*,
  568 F.3d 390 (2d Cir. 2009) ............................................................24

*Jim Henson Productions, Inc. v. John T Brady & Assocs., Inc.*,
  16 F. Supp. 2d 259 (S.D.N.Y. 1997) ...............................................25

*Kass v. Kass*,
  91 N.Y.2d 554, 673 N.Y.S.2d 350, 696 N.E.2d 174 (1998) ............36

*Kinek v. Paramount Commc'ns., Inc.*,
   22 F.3d 503 (2d Cir. 1994) ..........................................................32

*Luitpold Pharms., Inc. v. Ed. Geistlich Sohne A.G. Fur Chemische
   Industrie*,
   784 F.3d 78 (2d Cir. 2015) ....................................................23, 35

*Mason v. Jamie Music Publ'g. Co.*,
   658 F. Supp. 2d 571 (S.D.N.Y. 2009) ..........................................25

*Mastrovincenzo v. City of New York*,
   435 F.3d 78 (2d Cir. 2006) ..........................................................45

*Omni Berkshire Corp. v. Wells Fargo Bank, N.A.*,
   307 F. Supp. 2d 534 (S.D.N.Y. 2004) ..........................................25

*P.C. Films Corp. v. MGM/UA Home Video Inc.*,
   138 F.3d 453 (2d Cir. 1998) ........................................................25

*Papa's-June Music, Inc. v. McLean*,
   921 F. Supp. 1154 (S.D.N.Y. 1996) .............................................25

*Reiss v. Financial Performance Corp.*,
   97 N.Y.2d 195, 738 N.Y.S.2d 658, 764 N.E.2d 958 (2001) ............38

*Revson v. Cinque & Cinque, P.C.*,
   221 F.3d 59 (2d Cir. 2000) ..........................................................23

*Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan*,
   7 F.3d 1091 (2d Cir. 1993) ....................................................25, 29

*Seiden Assocs. v. ANC Holdings, Inc.*,
   959 F.2d 425 (2d Cir. 1992) ....................................................25, 35

*Spinelli v. NFL*,
   903 F.3d 185 (2d Cir. 2018) ......................................22, 29, 30, 46

*United States v. Am. Soc'y of Composers, Authors & Publishers*,
   627 F.3d 64 (2d Cir. 2010) ..........................................................41

*Vermont Teddy Bear Co. v. 538 Madison Realty Co.*,
   1 N.Y.3d 470, 775 N.Y.S.2d 765, 807 N.E.2d 876 (2004) ..............38

*Werbungs Und Commerz Union Austalt v. Collectors' Guild, Ltd.*,
    930 F.2d 1021 (2d Cir. 1991) ........................................................24, 35

**Statutes**

U.S. Copyright Act, 17 U.S.C. §§ 101 *et seq.* ........................................1, 4

17 U.S.C. § 101 ...............................................................................25

17 U.S.C. § 106 ...............................................................................22

28 U.S.C. § 1291 ...............................................................................5

28 U.S.C. §§ 1331, 1338 .....................................................................4

28 U.S.C. § 1367(a) ........................................................................5, 47

**Rules**

Fed. R. Civ. P. 12(b)(6)..........................................................1, 6, 16, 24

**Treatises**

3 Nimmer on Copyright § 10.15 (2018) ...............................................22

1 William F. Patry, *Copyright Law and Practice* (1994) .........................26

**Other Authorities**

*Royalty*, Merriam-Webster.com Dictionary
    https://www.merriam-webster.com/dictionary/royalty ......................................34

*Royalty*, Oxford Languages
    https://www.google.com/search?safe=active&sca_esv=378a65601
    2f4430f&rlz=1C1GCEA_enUS1032US1032&q=royalty&si=ACC
    90nypsxZVz3WGK63NbnSPlfCBohhtAboyGne22t_8ooc4VxDv2
    SDPZnoX3wkEaCYV_a7M9nGYcknhGhe2at5qZREfo7cN0Q%3
    D%3D&expnd=1&sa=X&sqi=2&ved=2ahUKEwjk8LmO--
    WGAxWYD1kFHaBWAPkQ2v4IegQIKBAc&biw=2560&bih=13
    13&dpr=1 ...........................................................................................34

*Royalty*, The Britannica Dictionary
    https://www.britannica.com/dictionary/royalty................................................34

B. Gonzalez, *The Difference Between Streaming and Downloading Media*, Lifewire (Mar. 25, 2022) https://www.lifewire.com/difference-between-streaming-and-downloading-media-1847372 ...............................................................41

*Unabridged*, Merriam-Webster.com Dictionary https://www.merriam-webster.com/dictionary/unabridged ..............................44

*Unabridged*, The Britannica Dictionary https://www.britannica.com/dictionary/unabridged ...........................................44

## PRELIMINARY STATEMENT

Plaintiff-appellant Teri Woods Publishing, LLC ("TWP") brought this action for copyright infringement because its licensee, defendant-appellee Urban Audio Books, LLC ("UAB"), and UAB's sublicensees, defendants-appellees Amazon.com, Inc. ("Amazon"), Audible, Inc. ("Audible") and Blackstone Audio, Inc. ("Blackstone") (all together, "Appellees"), were exploiting twenty of TWP's copyrighted works (the "TWP Works") in audiobook form in a manner TWP did not authorize in its license agreement with UAB (the "License Agreement").[1] When copyright licensees exceed the scope of the rights granted in their licenses, they engage in acts of infringement for which a copyright owner can obtain relief under the U.S. Copyright Act, 17 U.S.C. §§ 101 *et seq.* TWP brought this action to vindicate its rights as a copyright owner.

Appellees moved to dismiss TWP's copyright claims under Fed. R. Civ. P. 12(b)(6), arguing that the only plausible reading of the License Agreement was that it unambiguously authorized the acts TWP claimed were infringing. The District Court (Irizarry, J.) agreed with Appellees and dismissed TWP's infringement claims with prejudice. That decision was wrong. Here's why.

---

[1] The License Agreement appears at pages 38-41 of the accompanying Joint Appendix (abbreviated as "JA" in this brief).

First, the District Court interpreted the License Agreement to have permitted Appellees to distribute audiobook versions of the TWP Works for "free." That result is not what the text of the License Agreement permitted, not what the structure of the Agreement contemplated, and not what the parties could have possibly intended when they signed it. TWP's copyrights are its primary assets and represent the life's work, creatively speaking, of TWP's principal, the author Teri Woods. The District Court did not even address in its decision below TWP's well-pleaded factual allegations that Appellees were giving away the TWP Works on which Ms. Woods has labored so hard for "free" in a manner TWP never authorized, simply holding that whatever Appellees were doing was within their rights. This holding was error. This Court should reverse.

Second, the District Court read the License Agreement to have permitted Appellees to distribute the TWP Works through subscription streaming platforms they operate, where member-subscribers need not pay for individual audiobooks, but can access them by paying membership fees, redeeming membership credits, or in other ways. In these circumstances, TWP would not receive a royalty on individual sales, but some sort of payment (if any) calculated on something called "Qualified Listens," using a formula Appellees won't disclose. The District Court also found nothing wrong with this, holding that the License Agreement "contains no implied restriction to per unit sales." JA 157.

That holding was also error. In exchange for the grant of rights in Section I of the License Agreement, TWP was to receive "royalties" required under Section II that varied by the three specific types of permitted distribution methods. JA 38-39. A "royalty" is (literally) by definition a method of compensation that *requires* compensation based on individual sales of a work, *see* pp. 33-34, *infra*, not on a contrivance like "Qualified Listens," whatever that means. Because Section II of the License Agreement limited the distribution of audiobook versions of the TWP Works to methods that generated a per-unit or per-copy "royalty" for TWP, and Appellees' subscription services do not qualify, they exceeded the scope of the rights they were granted and thereby engaged in copyright infringement.

The District Court's contrary interpretation was based on an inconsistent consideration of other provisions of the License Agreement and an interpretive approach in conflict with how contracts are supposed to be construed, especially on a motion to dismiss. The District Court also conspicuously declined to address where the distribution of the TWP Works through a subscription service fits within the three types of distribution methods enumerated in Section II – a telling omission that highlights how the scope of the License Agreement is, at the very least, ambiguous. When a party like TWP offers a reasonable interpretation of a contract it signed, that contract is necessarily ambiguous. And it is for juries, not judges on pre-answer motions, to decide the scope of ambiguous contracts.

Third, the District Court erred by construing the License Agreement to have authorized Appellees to let customers access five-minute excerpts of the TWP Works at no charge. The License Agreement granted Appellees only the right to distribute (not just manufacture) "unabridged" audiobook versions of the TWP Works, and it explicitly restricted the use of excerpts of those Works solely for purposes of advertising and promotion. The District Court ignored this restriction in the decision below and instead accepted an interpretation that imposed no limit on how excerpts of the TWP Works could be used by Appellees, both in terms of duration and purpose. This too was error.

Accordingly, this Court should reverse the decision below, allow TWP to enforce its rights as a copyright owner, and reinstate TWP's claims for direct and secondary copyright infringement. This Court should also reinstate TWP's New York state claims against UAB, which were dismissed without prejudice below, because supplemental jurisdiction over them would be restored upon the reinstatement of TWP's federal copyright claims.

## JURISDICTIONAL STATEMENT

The District Court had subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338, as this case involves claims of copyright infringement arising under the U.S. Copyright Act, 17 U.S.C. §§ 101, *et seq*. JA 12-36. The District Court had supplemental jurisdiction over TWP's New York State contract claims

4

against UAB under 28 U.S.C. § 1367(a) because those claims are so related to

TWP's federal copyright claims that they form part of the same case or controversy

under Article III of the United States Constitution. *Id.* TWP filed a timely appeal

on April 25, 2024 from the Order and Judgment, which were entered below on

March 30 and April 2, respectively. JA 146-163. This Court's jurisdiction is

based on 28 U.S.C. § 1291, which provides for jurisdiction over a final decision

from a U.S. District Court like that below that finally disposed of all parties'

claims.

## ISSUES PRESENTED

1.     Did the District Court err by construing the License Agreement's
grant of rights in Section I to permit, as a matter of law, the distribution of the
TWP Works for "free" to members of Appellees' subscription platforms?

2.     Did the District Court err by construing the License Agreement's
grant of rights in Section I to permit, as a matter of law, the distribution of the
TWP Works through subscription membership platforms that, to the extent they
generated any revenue at all, did so other than as permitted by Section II of the
License Agreement?

3.     Did the District Court err by construing the License Agreement's
grant of rights in Section I to permit, as a matter of law, the distribution of the

5

TWP Works in a manner allowing consumers to access excerpts of the TWP Works at no charge?

4.     Did the District Court err in dismissing TWP's claims of secondary copyright infringement against UAB and Blackstone with prejudice, and TWP's contract claims against UAB without prejudice?

## STATEMENT OF THE CASE

This action was commenced on January 24, 2023, when TWP filed suit against Appellees, asserting a claim for breach of contract against UAB (Count I), breach of the implied covenant of good faith and fair dealing against UAB (Count II), direct copyright infringement against all Appellees (Count III), and secondary copyright infringement against UAB and Blackstone (Count IV).  JA 12-53.

Appellees filed motions under Fed. R. Civ. P. 12(b)(6) to dismiss TWP's copyright claims (and, in UAB's case, to dismiss TWP's contract claims as well) on April 7, 2023.  JA 54-57.  On March 30, 2024, the District Court (Irizarry, J.) issued its unreported Order granting Appellees' motions to dismiss TWP's copyright claims with prejudice, and dismissing TWP's contract claims against UAB without prejudice.  JA 146-161.  This appeal followed.

### A.     **Teri Woods and TWP**

Teri Woods is a renowned author whose books have attracted millions of readers, become *New York Times* best sellers, and even been made into a series of

feature films.  JA 12.  In 2002, Woods formed TWP to publish her own works and the works of others, principally in the urban fiction genre – a demographic largely ignored by major publishers.  JA 18.  TWP is the owner or exclusive licensee of all of the TWP Works, all of which are registered with the U.S. Copyright Office.  JA 19, 42-43.

**B.** **The License Agreement**

As a result of Woods' literary success, on or about December 19, 2018, TWP (as "Licensor") licensed to UAB (as "Licensee") the right to create and distribute audiobook versions of the TWP Works on terms set forth in the License Agreement.  JA 12-13, 19.  Section I of that contract provided as follows:

> I.      Licensor hereby grants to Licensee the **exclusive** unabridged audio publishing rights, to manufacture, market, sell and distribute copies throughout the World, and in all markets, copies of unabridged readings of the following literary work(s) and title(s) on cassette, CD, MP3-CD, pre-loaded devices, as Internet downloads and on, and in, other contrivances, appliances, mediums and means (now known and hereafter developed) which are capable of emitting sounds derived from the recording of audiobooks: . . . .

JA 38 (emphasis in original).  A list of the twenty TWP Works, and the recoupable advances to TWP that UAB agreed to pay for each individual Work, appeared in the balance of Section I.  *Id.*

Section II of the License Agreement enumerated the bargained-for consideration TWP would receive in exchange for the grant of rights in Section I, as follows:

7

II.    1.    As consideration for the aforementioned rights and license granted by Licensor to Licensee, Licensee shall pay to Licensor a sum equivalent to:

(a)    **Ten percent (10%)** of Licensee's net receipts from catalog, wholesale, and other retail sales and rentals of the audio recordings of said literary work;

(b)    **Twenty Five percent (25%)** of net receipts on all internet downloads of said literary work.

(c)    **Twenty Five percent (25%)** of net receipts on Playaway format sales in respect of which Playaway (A) produces the particular Playaway unit concerned (with Licensee furnishing Playaway with the audio to produce such unit); (B) sells such unit through Playaway's channels; and (C) pays a royalty to Licensee in respect of Playaway's sales of such unit.[2]

2.    Net receipts shall be defined as the actual cash proceeds received by Licensee, after deducting a twenty percent (20%) reserve, returns, discounts and allowances, and sales taxes, shipping and handling charges which may be included in the sales or rental prices, but without deductions of any other kind.  No royalty shall be payable on copies supplied gratis for review, advertising, sample or like purposes.  Licensee shall render a statement of sales and royalties due Licensor within one hundred (100) days after June 30 and December 31 of each year for the preceding six-month period.  Such settlement shall be accompanied by a check for all sums due to Licensor.

JA 39 (emphasis in original).  Section II of the License Agreement contained

an additional subsection (3) that addressed when TWP would be paid its

advances.  *Id.*

---

[2] There is no dispute that "Playaway format sales" are not at issue on TWP's claims.  JA 149.

Two other provisions of the License Agreement that bear on this appeal are

Section III, which the District Court cited in the Order, JA 157-158, and Section V,

which the District Court ignored:

> III.    Licensee shall maintain at its place of business complete records which detail all sales, rentals, transactions, receipts, and expenses.  Licensee shall maintain such records for a period of not less than three years.  Licensor or its duly authorized representative shall have the right at reasonable business hours and at Licensor's expense and upon at least five days' notice to Licensee, to examine such records insofar as they pertain to this Agreement.
>
> V.    To facilitate the effective marketing of the product, Licensor hereby agrees to allow Licensee to use photographs of the literary work and its book jacket, artwork, script, and excerpts associated with or taken from the literary work or its book jacket (the "Promotional Materials"),, [sic] in the packaging and promotion of the product (excerpts are not to exceed 7500 words), if Licensor owns the rights to said art.  In the event Licensor does not own the rights to said art, Licensor will use their best effort to assist Licensee in acquiring the rights to said art, provided that the failure of Licensor to do so shall not constitute a breach.  Notwithstanding any of the foregoing, Licensee may use the Promotional Materials solely in connection with the promotion and advertisement of the recorded work produced pursuant to this Agreement.  Subject to Licensor's agreement with the Author, Licensor further grants Licensee the right to use the Author's name in any advertisement or other publicity solely to promote the rental or sale of the recorded work, provided that any such use of the Author's name is not an endorsement or testimonial.

JA 39.

## C.    **UAB Exceeds the Scope of the Rights Granted in the License Agreement**

At the inception of the License Agreement, through the end of 2019, UAB

reported to TWP sales of the TWP Works on a per-unit or per-copy basis,

consistent with Section II of the License Agreement.  JA 105-112.  That is, each copy of a TWP Work that was distributed, regardless of the medium of distribution, generated a royalty, *i.e.* a percentage of revenue from each individual copy sold, for TWP.  *Id.*; JA 21, 112.

However, by the second half of 2020, approximately eighteen months after the License Agreement was executed, TWP's royalties dropped materially, even though UAB's royalty statements showed that unit sales of the TWP Works had substantially increased.  JA 21, 119.  The drop in royalties, notwithstanding substantially larger "Unit[s] sold," JA 119, was apparently due to Appellees' distribution of the TWP Works through subscription-based digital streaming services that each of them operated.  *Id.*; JA 23-24, 26-27.

TWP would later learn that, at some point after entering into the License Agreement, UAB purportedly sublicensed to Blackstone the right to distribute the TWP Works under Section XI(3) of the License Agreement, which provided that UAB "shall have the right to assign this Agreement and any or all of the tights granted to it hereunder to, and to sublicense to, any other person, [or] firm."  JA 22-23, 40.[3]  At some point thereafter, Blackstone purported to sublicense to Amazon/Audible the right to distribute the TWP Works, including as digital

---

[3] The License Agreement contained two Sections denominated as "XI."  The "Assignability" Section was Subsection 3 of the second Section XI, under the heading "Miscellaneous Provisions."  JA 40.

streams.  *Id.*  As of the time this action was commenced, all Appellees sold the TWP Works through their subscription membership services.  JA 23-24, 26-27. Blackstone was credited as the "publisher" of most of the TWP Works on the Amazon/Audible platforms, in addition to UAB, in some cases without crediting TWP.  JA 22-23, 27-28.

As of the time this action was commenced, the TWP Works were distributed by Amazon/Audible via their subscription services, through which members, in exchange for monthly fees, could stream "thousands of included audiobooks, podcasts, originals and more," without making any specific payment for the audiobooks being streamed.  JA 140-142.  By way of example, Amazon offered the TWP Work titled *True to the Game* to Amazon/Audible members for "$0.00" along with the words "Free with your Audible trial," JA 44-49, while simultaneously trying to discourage individual purchases of that audiobook.  JA 23, ¶ 38.  In addition to characterizing the TWP Works as being available for "free" to Audible members, Amazon/Audible also allowed Amazon Prime members to download into an Audible library two free audiobooks upon signing up for an Audible Premium Plus membership; one additional audiobook per month thereafter; and unlimited listening to additional audiobooks in Audible's Plus Catalog.  JA 23.  These credits could be used by Audible Premium Plus members

11

to download the TWP Works, without making any purchases of those works that would generate revenue for TWP. *Id.*

As for UAB and Blackstone, they too offer substantially similar online services through which audiobooks that have included the TWP Works are made available on a subscription basis to members who pay monthly fees. JA 26-27. Likewise, UAB and Blackstone also offer members credits that can be redeemed for a digital download of an eligible audiobook, including the TWP Works, and likewise discourage purchases of individual audiobooks by steering consumers into becoming members-subscribers of their respective services instead of making individual purchases. *Id.*

By distributing the TWP Works through platforms on which subscription members need not pay for individual audiobooks like the TWP Works and can access them through the redemption of credits, or otherwise at no charge, Appellees exceeded the scope of the rights granted under Sections I and II the License Agreement. JA 38-39. TWP only authorized the "sale[]," "rental[]" or "download[]" of the TWP Works, or through "Playaway format sales," in exchange for "royalties" paid at contractually specified rates. JA 39. However, all of the Appellees made the TWP Works available to their subscribers for "free," at least in certain circumstances, and/or in a manner that generated no per-unit or per-copy "royalty" for TWP. JA 23-24, 26-27, 44-49, 141-142.

**D.    TWP Asks for Information Concerning the Distribution
of Its Works and Receives Vague or Bellicose Responses**

By late 2021, TWP was asking UAB questions about why its royalty payments were declining, how the TWP Works were being distributed, why the TWP works were being made available at no charge, and how TWP's royalties were being calculated when the TWP Works were offered through subscription membership platforms.  JA 25.  In October of that year, counsel for UAB wrote to TWP as follows:

> Streaming royalties are designated on the accounting statements as "Digital Streaming".  The streaming royalties are based on a complicated formula utilized by Audible, the distributor for streaming media, using total minutes consumed as Qualified Listens.  A Qualified Listen occurs when a user listens to more than five minutes of a title.  Audible accounts to Company based on total minutes consumed which is under "Units Sold".

> The difference between Digital Downloads and Streaming Royalties is that each single Digital Download is paid a royalty, whereas Streaming Royalties are calculated based on total Qualified Listens (the aggregate time users listen to the title) multiplied by a streaming rate.  This formula is calculated by Audible and reported to [UAB] as a dollar figure for accumulated minutes known as total Qualified Listens.

JA 25, 143-145.  None of this was contemplated by Section II of the License Agreement, which did not say anything about payments based on "Qualified Listens" by members of a subscription service, but instead required, in Sections II(1)(a) and (b), payments on "net receipts from catalog, wholesale and other retail sales and rentals of the audio recordings of said literary work" and "net receipts on

13

all internet downloads of said literary work." JA 39. To make matters even more unclear, even though UAB took the position in its October 2021 correspondence that "Digital Downloads" and "Streaming Royalties" were two different things, JA 25, 143-145, it was actually treating them as the same thing for purposes of royalty payment purposes. JA 119 (applying 25% royalty rate for internet downloads in License Agreement Section II(1)(b) to "Digital Streaming").

In addition, UAB's correspondence made clear that TWP was not being paid anything when members of Appellees' subscription streaming platforms listened to five minutes or less of audiobook versions of the TWP Works, JA 144-145, even though the License Agreement granted rights covering only the distribution of "unabridged" versions of those Works and specifically limited the use of "excerpts" of those Works "in the packaging and promotion of the product." JA 38-39.

At the same time, UAB's correspondence did not explain why the TWP Works were being made available for "free" to subscribers of Appellees' subscription services. JA 144-145.

Accordingly, on January 19, 2022, TWP emailed Audible's attorney, stating in relevant part that: "It has come to [Woods'] attention that her works being distributed on Audible violates the terms of the agreement between [TWP and UAB]. We believe Audible's sale, use, and distribution of [TWP's] audiobooks

14

exceed the rights granted under her license with [UAB], and as such Audible may be infringing [TWP's] copyrights by exploiting her works."  JA 27.

On January 24, 2022, Audible's counsel responded:

[a]ll rights holders who license content to Audible for distribution represent and warrant that they have the full right and authority to do so, for the full scope of rights granted. I am sorry to hear that your client is in dispute with their publisher, and I hope that they are able to come to a quick resolution. Audible does not intervene in third party disputes. If you have further questions, you may contact Anne Fonteneau at the audio publisher Blackstone Audio.

JA 27-28.  Within days thereafter, on January 28, 2022, UAB sent TWP a cease-and-desist letter accusing TWP of having "intentionally conducted unauthorized communications with its distributor in an effort to damage UAB's distribution relationship(s)."  The letter further stated that "in order to resolve this matter short of litigation, my client demands that you comply immediately with the following conditions: (1) CEASE and DESIST any and all communication with any distributor or any third party regarding the Agreement; (2) agree not to resume any communication in the future with any distributor or third party regarding the Agreement and refrain from any derogatory and defamatory statements and communication regarding UAB and the Agreement; and (3) sign and return the attached Confirmation of Compliance to my attention within five (5) days."  JA 28. Woods and TWP did not sign the proffered "Confirmation of Compliance."  *Id.*

This unsatisfactory exchange of correspondence was not the only effort TWP made to determine the extent to which its Works were being distributed in a manner the License Agreement did not permit. After receiving royalty statements that listed amounts irreconcilable with the License Agreement, TWP sought to audit UAB's books and records under Section III of the License Agreement, in order to better understand how the royalties under the License Agreement were being generated and calculated. JA 29. The attempted audit specifically included five titles for which TWP had not received *any* royalties: *Tell Me Your Name, The Adventures of Ghetto Sam, Circle of Sins, Rectangle of Sins* and *Double Dose*. *Id.* Although the last two audiobooks were listed as "BEST SELLERS" on Audible, UAB reported no royalties generated at all. *Id.* The audit uncovered other inconsistencies and errors that UAB was similarly unable to explain or reconcile. *Id.*

**E.    TWP Notifies Appellees of Their Infringement, Terminates the License Agreement, and This Lawsuit Follows**

On January 17, 2023, TWP terminated the License Agreement due to UAB's material breaches thereof, by sending a letter to UAB and copying the other Appellees. JA 30. Following the initiation of this action in January 2023, Appellees filed motions to dismiss under Fed. R. Civ. P. 12(b)(6) on April 7, 2023. JA 54-57. The Court below decided those motions against TWP on March 30, 2024. JA 146-161. After reviewing various sections of the License Agreement,

16

the Court concluded that: (i) "[w]hile distribution of the [TWP] Works via subscription streaming service may not have been explicit in the [License] Agreement, its unambiguous terms encompass that right"; and (ii) allowing users to access the TWP Works for free in 'listens' shorter than five minutes did not violate the License Agreement's grant of rights limited to "unabridged works." JA 154-159. As Appellees' exploitation of the TWP Works did not exceed the grant of rights in the License Agreement, based on the Court's interpretation of that Agreement as a matter of law, TWP's direct and secondary copyright infringement claims were dismissed with prejudice. JA 159-161. As for TWP's contract claims against UAB, the Court declined to reach them, declined to exercise supplemental jurisdiction over them, and therefore dismissed them without prejudice. JA 160-161.

## SUMMARY OF ARGUMENT

The District Court's holding that the License Agreement unambiguously permitted Appellees to exploit the TWP Works in a manner that exceeded the scope of the rights granted by TWP is contrary to New York principles of contract interpretation; at odds with the text, structure and purpose of the License Agreement; internally inconsistent; and would, unless reversed, produce an absurd result. In contrast, TWP has offered a reasonable interpretation of the License Agreement to support its position that Appellees exceeded the rights they were

17

granted by exploiting TWP's copyrighted works in a manner the contract did not authorize. Since the use by a copyright licensee of a licensed work in a manner beyond the scope of the license is an infringement of the licensor's copyright as a matter of law, TWP plausibly pleaded claims of direct and secondary infringement that the District Court should not have dismissed under Rule 12(b)(6).

There were three primary errors in the District Court's analysis. First, it interpreted the License Agreement to authorize unambiguously the distribution of the TWP Works for "free," without restriction, barely mentioning this aspect of TWP's copyright infringement claims, even though multiple paragraphs in TWP's Complaint pleaded that the distribution of the TWP Works without compensation was never authorized, and therefore infringing. Indeed, numerous provisions of the License Agreement made clear that TWP was to receive royalties in exchange for the grant of rights it gave to UAB, and by extension to the other Appellees. An interpretation of the License Agreement permitting the "free" distribution of the TWP Works is unreasonable, particularly in the context of Rule 12(b)(6) motions.

Second, the District Court erred by construing the License Agreement to have authorized Appellees to distribute the TWP Works via subscription platforms, in which members either pay monthly fees to stream or otherwise access copyrighted works, or access such works through the redemption of credits. To the extent this distribution method generated royalties for TWP, it did so only on

"Qualified Listens," not on a per-unit or per-copy basis, as the License Agreement required. There cannot be a credible dispute that TWP was to receive "royalties" under Section II of the License Agreement in exchange for the grant of rights in Section I. "Royalties" are monetary payments that are necessarily calculated on individual, per-copy sales of a copyrighted work, as multiple dictionaries confirm, and are not calculated on "Qualified Listens." The only permissible distribution models authorized under Sections I and II are those that generate "royalties." Subscription platforms do not qualify. The District Court's holding that they do as a matter of law was therefore incorrect; at the very least, there are reasonably competing interpretations of the License Agreement on this point that create an ambiguity only a jury can resolve.

Indeed, the District Court's construction of the License Agreement in this regard misread certain provisions, ignored others, and inconsistently applied New York principles of contract interpretation. The District Court's analysis also consciously left glaring questions unanswered: if distribution of the TWP Works via a subscription platform was within the grant of rights, then how was TWP to receive compensation, and on what basis was that compensation to be calculated? The District Court's decision to refrain from answering these questions highlights, at a minimum, the contractual ambiguities that should have resulted in the denial of Appellees' motions.

19

Third, the District Court erred by holding that the License Agreement authorized Appellees to allow consumers to access excerpts of the TWP Works without charge. Section I of the contract only granted Appellees the right to market "unabridged" versions of those Works, and Section V provided that excerpts could only be used "solely in connection with the promotion and advertisement of the recorded work . . . ." The District Court wholly ignored the existence of that latter restriction in the decision below, instead basing this aspect of its holding on *Black's Law Dictionary* definitions of two terms – "abridge" and "abridged" – that do not appear in the contract. By disregarding the express terms of the License Agreement in Section V, the District Court promulgated an interpretation that would have allowed Appellees' subscribers to access excerpts of the TWP Works of unlimited duration, at no charge. The District Court's failure to consider the absurd result its interpretation would produce demonstrates that its interpretation was incorrect, particularly on Appellees' motions to dismiss.

Given the flaws in the District Court's analysis, it should not have dismissed TWP's claims of direct copyright infringement against all Appellees, and this Court should reverse that dismissal. Since the dismissal of TWP's direct infringement claims was the only ground cited by the District Court for its dismissal of the secondary infringement claims pleaded against UAB and Blackstone, this Court should also reverse the dismissal of those claims. Finally,

20

in light of the fact that TWP properly pleaded claims of copyright infringement against all Appellees, the District Court possesses supplemental jurisdiction over TWP's contract claims against UAB. Accordingly, this Court should reverse the dismissal of those contract claims as well.

## STANDARD OF REVIEW

This Court reviews *de novo* the dismissal of a complaint under Rule 12(b)(6) for failure to state a claim, "accepting as true all factual claims in the complaint and drawing all reasonable inferences in the plaintiff's favor." *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 769 (2d Cir. 2016).

> To survive dismissal, the plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient "to raise a right to relief above the speculative level." Once a claim has been adequately stated, it may be supported by showing any set of facts consistent with the allegations in the complaint.

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98 (2d Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007)).

## ARGUMENT

### THE DISTRICT COURT MADE THREE FUNDAMENTAL ERRORS IN CONSTRUING THE LICENSE AGREEMENT AS A MATTER OF LAW AND DISMISSING TWP'S COPYRIGHT INFRINGEMENT CLAIMS

A claim of copyright infringement under federal law "requires proof that (1) the plaintiff had a valid copyright in the work allegedly infringed and (2) the defendant infringed the plaintiff's copyright by violating one of the exclusive

rights that 17 U.S.C. § 106 bestows upon the copyright holder." *Island Software &
Computer Serv. v. Microsoft Corp.*, 413 F.3d 257, 260 (2d Cir. 2005) (cleaned up).
Among the exclusive rights of a copyright holder under 17 U.S.C. § 106 are the
rights to "reproduce the copyrighted work in copies or phonorecords"; to "prepare
derivative works based upon the copyrighted work"; and to "distribute copies or
phonorecords of the copyrighted work to the public by sale or other transfer of
ownership, or by rental, lease, or lending." *See* 17 U.S.C. § 106. There cannot be
any credible dispute that TWP plausibly pleaded these required elements of a
copyright infringement claim. JA 19-20, 23-27, 32-35, 42-49.

However, the validity of TWP's copyright claims for present purposes
depends on the scope of the License Agreement, and whether the District Court
was correct in deciding that Appellees did not exceed the scope of the License
Agreement as a matter of law. This is because copyright infringement by a
licensee or sublicensee only occurs when there is exploitation of the licensed
works beyond the scope of the rights granted by the licensor. In *Spinelli v. NFL*,
903 F.3d 185, 202 (2d Cir. 2018), this Court confirmed this principle:

> Typically, a copyright owner who licenses his work to another
> "waives his right to sue the licensee for copyright infringement."
> *Graham v. James*, 144 F.3d 229, 236 (2d Cir. 1998). But that rule
> holds true only where the defendant licensee "uses the copyright as
> agreed with the licensor." [*Davis v. Blige*, 505 F.3d 90, 100 (2d Cir.
> 2007)]; *see also* 3 Nimmer on Copyright § 10.15 (2018) ("More
> generally, when a license is limited in scope, exploitation of the

22

copyrighted work outside the specified limits constitutes infringement.").

*See also Gilliam v. ABC*, 538 F.2d 14, 20-21 (2d Cir. 1976) ("unauthorized editing of the underlying work, if proven, would constitute an infringement of the copyright in that work similar to any other use of a work that exceeded the license granted by the proprietor of the copyright"); *Harris v. Simon & Schuster, Inc.*, 646 F. Supp. 2d 622, 631 (S.D.N.Y. 2009) ("[I]nsofar as [plaintiff] alleges that [defendant] exceeded the scope of its Licenses by publishing the Work in states other than those identified, he states a valid claim for copyright infringement.").[4]

New York law, informed by principles of federal copyright law, governs the question of whether the License Agreement did or did not authorize the reproduction or distribution of the TWP Works in the manner to which TWP has objected. JA 40, 152. "The threshold question in a dispute over the meaning of a contract is whether the contract terms are ambiguous," which is "a question of law for the court to decide." *Revson v. Cinque & Cinque, P.C.*, 221 F.3d 59, 66 (2d Cir. 2000). The only ground for an affirmance of the decision below would be a

---

[4] In the decision below, the District Court stated that "[i]f possession of a license is not in dispute, the copyright owner bears the burden of showing that the activities exceeded the scope of the license," citing *Bourne v. Walt Disney Co.*, 68 F.3d 621, 631 (2d Cir. 1995). JA 153. While this legal principle was correctly stated, it has no application in the present procedural context, where TWP is to be given the benefit of every favorable inference, and all of its plausible factual allegations must be taken as true. *See Luitpold Pharms., Inc. v. Ed. Geistlich Sohne A.G. Fur Chemische Industrie*, 784 F.3d 78, 85 (2d Cir. 2015).

23

conclusion by this Court that the License Agreement unambiguously permitted the conduct upon which TWP's copyright infringement claims are premised. *See Chapman v. N.Y. State Div. for Youth*, 546 F.3d 230, 235-37 (2d Cir. 2008) (reversing Rule 12(b)(6) dismissal of copyright infringement claims where license was ambiguous and no extrinsic evidence weighed in favor of either party's plausible interpretations).

Contract language is "unambiguous only if it has a definite and precise meaning, unattended by danger of misconception in the purport of the contract itself, and concerning which there is no reasonable basis for a difference of opinion." *Gary Friedrich Enters., LLC v. Marvel Characters, Inc.*, 716 F.3d 302, 313-15 (2d Cir. 2013 (cleaned up). However, "ambiguous language is language that is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is generally understood in the particular trade or business." *JA Apparel Corp. v. Abboud*, 568 F.3d 390, 396-97 (2d Cir. 2009) (cleaned up); *see also Werbungs Und Commerz Union Austalt v. Collectors' Guild, Ltd.*, 930 F.2d 1021, 1026 (2d Cir. 1991) ("Contract language is ambiguous if reasonable minds could differ as to its meaning.").

In determining whether a contract has only one, unambiguous meaning, or could be read in different ways, the goal of the analysis is to "give effect to the

24

intent of the parties as revealed by the language they chose to use." *Seiden Assocs. v. ANC Holdings, Inc.*, 959 F.2d 425, 428 (2d Cir. 1992); *see also Omni Berkshire Corp. v. Wells Fargo Bank, N.A.*, 307 F. Supp. 2d 534, 539-40 (S.D.N.Y. 2004) ("Under New York law, the key to contract interpretation is the parties' reasonable expectations.") (cleaned up). And the Court must consider the entirety of the License Agreement, not simply isolated words and phrases. *Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan*, 7 F.3d 1091, 1095 (2d Cir. 1993).

Apart from these New York legal principles, there are also precepts of federal copyright law that are applicable here. *See P.C. Films Corp. v. MGM/UA Home Video Inc.*, 138 F.3d 453, 456 (2d Cir. 1998) ("As a license of federal copyright rights, the Basic Agreement was subject to the provisions, principles and policies of federal copyright law."). An exclusive copyright license like that embodied in the License Agreement is a "transfer of copyright ownership" within the meaning of 17 U.S.C. § 101. Under the Copyright Act, when it comes to transfers like the License Agreement, "[a]ny ambiguities or doubts concerning the scope of rights assigned by the [authors] . . . must be construed in favor of the [authors]." *Mason v. Jamie Music Publ'g. Co.*, 658 F. Supp. 2d 571, 581 (S.D.N.Y. 2009) (citing *Jim Henson Productions, Inc. v. John T Brady & Assocs., Inc.*, 16 F. Supp. 2d 259, 285 (S.D.N.Y. 1997); *Papa's-June Music, Inc. v. McLean*, 921 F. Supp. 1154, 1160 (S.D.N.Y. 1996) ("[T]ransfer agreements should be construed in

25

favor of copyright transferor because section 204(a) reflects the policy judgment that copyright owners should retain all rights unless specifically transferred." (citing 1 William F. Patry, *Copyright Law and Practice* (1994) at 392)). Thus, it is TWP, not Appellees, that should receive the benefit of any doubts when it comes to what the License Agreement did – or did not – grant.

Here, when the required analysis is undertaken, it is apparent that, at a bare minimum, the License Agreement is ambiguous on the question of whether Appellees' reproduction and distribution of the TWP Works in the manner described in the Complaint was or was not authorized, such that this Court should reverse the decision below. That decision was the product of three significant errors that warrant reversal.

A.    **The License Agreement Did Not Permit "Free" Distribution of the TWP Works**

The first of the District Court's errors was its complete failure to address TWP's repeatedly pleaded allegations that Appellees were allowing customers to access audiobook versions of the TWP Works at no charge. *See* JA 13, ¶ 2 (". . . both UAB itself, and the remaining [Appellees] with UAB's apparent (but unauthorized) permission, have been giving away TWP's works for free to premium subscribers of their audiobook streaming and digital download services in a manner that has cannibalized Woods' other audiobook revenue streams, all in violation of the License Agreement, and all without properly compensating

26

TWP."); JA 13-14, ¶ 4 ("Indeed, Amazon advertises TWP's literary catalog as costing "$0.00" and/or being "free" for Audible members, yet audiobooks authored by Woods are listed on Amazon for purchase between $15 and $25. The License Agreement did not grant rights for TWP's works to be exploited in this manner."); JA 23, ¶ 38 ("The TWP Works are currently available on Amazon for "$0.00" along with the words "Free with your Audible trial," as shown in the true and correct copy of the Amazon.com page for *True to the Game* attached as Exhibit 3. In fact, there is ***no*** option to purchase the audiobook on Amazon without clicking through to another webpage. And, once there, the option to purchase is disguised with a low-contrast gray button with prices ranging from $10 to $30, which is directly below a high-contrast bright yellow button that states "$0.00 Try Audible Premium Plus Free."). *See also* JA 23-26, 30-31, ¶¶ 39, 41, 43, 46-50, 64, 68(ii).

The District Court only mentioned these allegations once (and then only in passing, JA 149-50), without ever addressing whether the License Agreement authorized Appellees to distribute the TWP Works at no charge. This omission was a serious interpretive and legal error because the License Agreement indisputably did not permit distribution of audiobook versions of the TWP Works for nothing. Indeed, multiple provisions of the contract demonstrate that the TWP Works were to be made available for sale, rental or downloading, not given away.

27

The District Court's interpretation of the contract was therefore at odds with the text, structure and purpose of the License Agreement.

Section I of the contract provided for the payment of advances on royalties on each TWP Work – royalties necessarily generated on sales of those Works. JA 38. Section II stated that the consideration for the grant of rights in Section I was payment to TWP of royalties based, in varying percentages, on the "net receipts" generated through the three types of distribution specified in that Section – sales/rentals, downloads and Playaway format sales. JA 39. "Net receipts" was defined as the "actual cash proceeds received by" UAB, after particular deductions for various charges and expenses that "may be included in the sales or rental prices." *Id.* Section II(2) even specifically stated that "No royalty shall be payable on copies supplied gratis for review, advertising, sample or like purposes," which plainly demonstrates that free distribution of the TWP Works to consumers was not authorized. *Id.* Yet, the decision below ignored all of these provisions, and in doing so adopted an interpretation of the License Agreement that not only would have authorized ***some*** free distribution of the TWP Works, but permitted the ***unlimited*** free distribution of such Works. Given how critical her copyrighted Works are to her livelihood as an author, it is inconceivable that Ms. Woods would have agreed to a contract that permitted such an extraordinary result.

28

In *Spinelli*, this Court held that a district court's construction of a copyright license as unambiguously permitting licensed photographs to be distributed on a complimentary basis was unreasonable for purposes of a motion to dismiss, in light of contractual provisions providing for only two, limited exceptions to the operative royalty-payment obligations. *Id.*, 903 F.3d at 200-202. Here, the only time royalties were not due to TWP under the License Agreement was when copies of the TWP Works were "supplied gratis for review, advertising, sample or like purposes." JA 39, Section II(2). If the License Agreement allowed free distribution of the TWP Works without restriction, this provision would be superfluous, which is the type of contract construction New York law does not favor. *See Int'l Multifoods Corp. v. Commercial Union Ins. Co.*, 309 F.3d 76, 86 (2d Cir. 2002) ("We disfavor contract interpretations that render provisions of a contract superfluous"); *Sayers*, 7 F.3d at 1094-95. So *Spinelli* is very much on point here, the District Court's effort to distinguish the case notwithstanding. JA at 156-157.[5]

---

[5] The District Court thought *Spinelli* was not on point because "the Royalties Section [of the License Agreement] does not require [TWP] to be compensated on a per-book basis," while the license at issue in *Spinelli* did expressly provide for the payment of royalties per photograph. JA at 156-157. As discussed, *infra*, in Point B, the License Agreement ***does*** require per-unit compensation. But putting that aside, *Spinelli* is a case in which a copyright licensee argued that its complimentary distribution of licensed works was permitted under the license, and this Court held that such an interpretation conflicted with the text, structure and

*Spinelli* also recognized that the complimentary distribution of the photos at issue in that case conflicted with the purpose of the agreement, which was to authorize the distribution of the plaintiffs' copyrighted photos in exchange for royalties. *Id.* Here, the purpose of the License Agreement was the same as in *Spinelli* – a grant of rights for which the consideration was the payment of royalties to TWP. JA 38-39; *see Chapman*, 546 F.3d at 236 (reversing dismissal of copyright claims where one interpretation of license agreement conflicted with its purpose, and the other interpretation was not supported by the text, making the agreement ambiguous); *Cromwell Towers Redevelopment Co. v. City of Yonkers*, 41 N.Y.2d 1, 6, 390 N.Y.S.2d 822, 826, 359 N.E.2d 333, 337 (1976) ("In construing the contract between [the parties], due consideration must be given to the purpose of the parties in making the contract."); *Farrell Lines, Inc. v. City of New York*, 30 N.Y.2d 76, 82, 330 N.Y.S.2d 358, 362, 281 N.E.2d 162, 165 (1972) ("A lease, like any other contract, is to be interpreted in light of the purposes sought to be attained by the parties.").

In sum, the District Court interpreted the License Agreement to permit the free distribution of the TWP Works without restriction, in a manner at odds with

---

purpose of the agreement, making the contract at least ambiguous. That aspect of *Spinelli* is highly relevant here, but it was wholly ignored in the decision below.

the contract's text, structure and purpose. Such an interpretation was necessarily unreasonable, especially in the context of Appellees' Rule 12(b)(6) motions.

**B.** **The License Agreement Did Not Grant Appellees the Right to Distribute the TWP Works in Ways That Deprived TWP of the Per-Copy "Royalties" to Which It Was Entitled**

The second major error in the District Court's interpretation of the License Agreement was its conclusion that the contract unambiguously permitted Appellees to distribute the TWP Works via subscription services in which members either pay monthly fees to stream or otherwise access copyrighted works, or access such works through the redemption of credits. JA 156-158. This distribution method generated royalties for TWP, if at all, only on "Qualified Listens," not on a per-unit or per-copy basis. JA 14, 25-26, 144-145. Because the License Agreement did not permit any of this, let alone unambiguously, the District Court's interpretation was flawed, and this Court should reverse it.

In the decision below, the District Court agreed that "[i]n determining the meaning of a contract, the Court 'look[s] to all corners of the document rather than view sentences or clauses in isolation,'" citing to *Int'l Klafter Co. v. Cont'l Cas. Co.*, 869 F.2d 96, 99 (2d Cir. 1989). JA 153. But that is not the analytical approach the District Court undertook to the degree it should have. Instead, it focused to a substantial extent on the "broad rights" granted to UAB under Section I of the License Agreement, JA 154, and it found that streaming services fell

31

within the phrase "'other contrivances, appliances, mediums and means (*now known and hereafter developed*)."  JA 155 (emphasis added by District Court). But the issue is not whether Section I covered streaming.  The question is whether distribution of the TWP Works through a subscription membership service – offered via streaming or some other technology – where royalties are paid on "Qualified Listens," to the extent paid at all, was authorized under the License Agreement.  Appellees say yes.  TWP says no, arguing that Appellees were only authorized to distribute the TWP Works in a manner that generated a per-unit or per-copy royalty for TWP.

To assess these competing interpretations, it is necessary to construe Section II and Section I together, as New York law requires.  *See Kinek v. Paramount Commc'ns., Inc.*, 22 F.3d 503, 509 (2d Cir. 1994).  But while the District Court did consider the meaning of Section II in assessing the scope of the grant in Section I, it did so incompletely in holding that Section II "contains no implied restriction to per unit sales . . . ."  JA 157.  This holding was based primarily on the fact that Section II(1)(c), concerned with "Playaway format sales," contained "explicit language requiring payment on a per unit basis [that] notably is absent in the preceding two clauses, Sections II(1)(a) and II(1)(b), and elsewhere in the Agreement."  JA 157.  Accordingly, per the District Court, per-unit payments under subsections II(1)(a) and II(1)(b), which were concerned with "sales and

32

rentals" and "internet downloads," were not required. *Id.* The District Court also cited Section III of the Agreement, which required UAB "to maintain 'complete records which detail all sales, rentals, transactions, receipts, and expenses,'" as supporting its interpretation. JA 157-158. According to the decision below, "[b]y adding 'transactions' and 'receipts' to sales and rentals, this indicates the parties contemplated a broader range of revenue models than [TWP's] per unit basis for compensation." *Id.*

The District Court's reliance on Sections II(1)(c) and III as the grounds for its unambiguous interpretation of the License Agreement was both wrong and internally inconsistent as explained, *infra*. But before explaining why that is so, it is critical to start first with what Section II required, namely the payment of ***royalties***. The District Court recognized that Section II required the payment to TWP of royalties as consideration for the grant of rights in Section I. JA 148-149. The District Court even denominated Section II as the "Royalties Section" of the Agreement. JA 148. Section II(2) also specifically stated that "[UAB] shall render a statement of sales ***and royalties*** due [TWP] within one hundred (100) days after June 30 and December 31 of each year for the preceding six-month period." JA 39 (emphasis added).

What is a royalty? The District Court never asked this question, and the License Agreement did not define the term. But dictionaries do. They make clear

33

that a "royalty" is inherently a form of compensation that is calculated on a per-unit or per-copy basis when it comes to copyrighted works.  According to *Merriam Webster*, a royalty is "a payment to an author or composer for ***each copy of a work sold*** or to an inventor for each item sold under a patent."  https://www.merriam-webster.com/dictionary/royalty (last visited June 13, 2024) (emphasis added). According to *Oxford Languages*, distributed through Google, a royalty is "a sum of money paid to a patentee for the use of a patent or to an author or composer for ***each copy of a book sold*** or for each public performance of a work."

https://www.google.com/search?safe=active&sca_esv=ee550f040f73c7f6&q=royalty&si=ACC90nypsxZVz3WGK63NbnSPlfCBohhtAboyGne22t_8ooc4VxDv2SDPZnoX3wkEaCYV_a7M9nGYcknhGhe2at5qZREfo7cN0Q%3D%3D&expnd=1&sa=X&ved=2ahUKEwj_vdmXmNSGAxVnMlkFHTsNA10Q2v4IegQIIxAc&biw=2560&bih=1313 (last visited June 13, 2024) (emphasis added).  And *Britannica* defines "royalty" as "an amount of money that is paid to the original creator of a product, book, or piece of music ***based on how many copies have been sold*** — usually plural."  *See* https://www.britannica.com/dictionary/royalty (last visited June 13, 2024) (emphasis added).

What these definitions mean is that, even if the District Court were to have been correct in its interpretations of Sections II(1)(c) and III (and it was not), there is a reasonable construction of the License Agreement that limited the grant of

34

rights in Section I to distribution methods that generated per-copy royalties for TWP, such that Defendants exceeded that grant of rights by distributing the TWP Works through subscription services that only generated payments, if at all, on "Qualified Listens." *See Luitpold Pharms., Inc.*, 784 F.3d at 86 ("One could reasonably read the agreements to mean that the parties did not agree to preserve for [licensor] the right to use the [licensed trademarks] in the United States and other covered territory during the license term"); *Werbungs Und Commerz Union Austalt*, 930 F.2d at 1026 ("because the contract is susceptible to more than one reasonable interpretation, the district court properly submitted the issue of contract interpretation to the jury"); *see also Seiden Assocs.*, 959 F.2d at 429 (even when two contract provisions are unambiguous when viewed in isolation, that "does not necessarily mean that when read together they will be").

As for the District Court's reliance on Sections II(1)(c) and III to support its construction of the contract, that reliance was misplaced. Section II(1)(c) was, as noted, concerned with "Playaway format sales" and required the payment of royalties on each "Playaway unit" produced by Playaway. JA 39. However, a "Playaway unit" is a device that contains a pre-loaded copy of an audiobook, not the audiobook itself. *See* U.S. Reg. No. 3,091,576 for PLAYAWAY covering ("portable digital audio player preloaded with non-transferable digital audio content") accessible at

35

https://tsdr.uspto.gov/#caseNumber=78550746&caseSearchType=US_APPLICAT
ION&caseType=DEFAULT&searchType=statusSearch (last visited June 13,

2024).[6]  The District Court, at a minimum, therefore placed undue emphasis on the

presence of the word "unit" in Section II(1)(c), but not in Sections II(1)(a) or (b),

because that term can reasonably be read to be concerned with a device, and not a

method of calculating royalties different from what Sections II(1)(a) and (b)

contemplated.  *See Kass v. Kass,* 91 N.Y.2d 554, 566, 673 N.Y.S.2d 350, 356-57,

696 N.E.2d 174, 180-81 (1998)) ("[C]ourts should examine the entire contract and

consider the relation of the parties and the circumstances under which it was

executed. Particular words should be considered, not as if isolated from the

context, but in [] light of the obligation as a whole and the intention of the parties

as manifested thereby." (internal quotation marks omitted)).

        As for Section III, the District Court's reliance on the presence of the terms

"transactions" and "receipts" there was not only misplaced, but entirely

inconsistent with the approach to contract interpretation it professed to undertake.

---

[6] Public records like trademark registrations may be considered on appellate review
of a decision granting a motion to dismiss.  *See Blue Tree Hotels Inv. (Canada),
Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.*, 369 F.3d 212, 217 (2d Cir.
2004); *Island Software & Computer Serv.*, 413 F.3d at 261.  Further, in their
moving brief below, Amazon, Audible and Blackstone referred the District Court
to the Playaway website for an explanation of what a Playaway unit is, without
objection from TWP.  *See* District Court Dkt. 27-1 at 7, citing
playaway.com/audiobooks/ (last visited June 13, 2024).

With respect to "receipts," that term appears multiple times in Section II, as UAB's "net receipts" are the sums on which TWP's royalties were supposed to be calculated. JA 39. The presence of that term in Section III therefore does not shed any light on what Section II did and did not permit.

As for the presence of the term "transactions" in Section III, but not in Section II, it is entirely understandable why broader language would have been used in Section III – an audit provision that gave TWP a broad right of access to "complete records which detail all sales, rentals, transactions, receipts, and expenses. . . . insofar as they pertain to this Agreement." JA 39. There are many records of "transactions" UAB could have entered into regarding the TWP Works that did not necessarily involve "sales," "rentals," "downloads" or "receipts," but that TWP would want to access as part of an audit. Among these records would be sublicenses permitted under Section XI(3) that were actually entered into by UAB with Blackstone and, apparently later, with Audible and Amazon. JA 40. Section XI(3) likewise permitted UAB to assign the License Agreement to a different company, in certain circumstances – another type of "transaction" that would not generate royalties for TWP, but that would be documented and within the scope of Section III. So in and of itself, the presence of the term "transactions" in Section III, but not in Section II, is readily explicable and does not support the unambiguous reading of the License Agreement adopted by the District Court.

37

Indeed, what is most important about the absence of the term "transactions" from Section II is what it reveals about both the parties' intentions, and the manner in which the District Court interpreted the License Agreement. If TWP had intended to grant rights to Appellees to distribute the TWP Works through "transactions" that generated payments other than on a per-unit or per-copy basis, then the parties surely would have drafted Section II to include that term. That they did not do so is significant, and the District Court should not have interpreted Section II to add an amorphous distribution model – other "transactions" – that the parties did not include themselves. *See Vermont Teddy Bear Co. v. 538 Madison Realty Co.*, 1 N.Y.3d 470, 476, 775 N.Y.S.2d 765, 768, 807 N.E.2d 876, 880 (2004) ("The parties could have negotiated and included an explicit notice requirement regarding completion of restoration within the time period set forth in paragraph 3 of the rider . . . They did not do so."); *Reiss v. Financial Performance Corp.*, 97 N.Y.2d 195, 199, 738 N.Y.S.2d 658, 661, 764 N.E.2d 958, 961 (2001) ("courts may not by construction add or excise terms, nor distort the meaning of those used [by the parties] . . . under the guise of interpreting the writing").

The District Court's reliance on Sections III and II(1)(c) also betrays its internally inconsistent approach to the construction of the License Agreement. On the one hand, the decision below ascribed great significance to the absence of the term "unit" from Sections II(1)(a) and (b), and that term's presence in Section

38

II(1)(c), as support for an interpretation that per-unit royalties were only contemplated by the latter. JA 157. But when it came to Section III, the District Court's approach was the opposite: the presence of the term "transactions" in that Section was deemed to support the District Court's interpretation, but that term's absence from Section II – the "Royalty Section" – was not even mentioned. JA 157-158. If the absence of "unit" from Sections II(1)(a) and (b) was significant, as the District Court incorrectly held, then the absence of "transactions" from the entirety of Section II should have been given at least equal emphasis and weighed in favor of TWP's interpretation. That it was not both demonstrates the flaws in the District Court's analysis, and the ambiguities in the License Agreement.

Yet another flaw in the District Court's analysis was its conscious decision to overlook the practical implications of its interpretation. The District Court held that the License Agreement unambiguously permitted the distribution of the TWP Works through subscription membership platforms that generate payments based on "Qualified Listens." The License Agreement required payment to TWP of royalties in varying percentages based on the type of distribution method at issue, again "sales and rentals," "internet downloads" and "Playaway format sales." JA 39. Where does a subscription membership platform fit into these three categories? The District Court declined to say, stating that it was "unnecessary for the Court to decide" this issue. JA 156. That aspect of the Court's holding speaks

39

volumes about how its interpretation of the License Agreement cannot be squared with what the contract said. For if the District Court's holding was correct, and the License Agreement unambiguously permitted distribution of the TWP Works through subscription services, then there would have to be an applicable royalty-payment provision of Section II. But there is none, because TWP did not grant any right to distribute the TWP Works through a subscription service.

This Court need only look at Section II to see this. The parties agreed below that the "Playaway format sales" referenced in Section II(1)(c) did not encompass subscription membership platforms. JA 149. With respect to the "sales and rentals" covered by Section II(1)(a), there is no "sale" and no "rental" when a member of a subscription service pays a membership fee to gain access to an array of audiobooks including the TWP Works, so this provision is not applicable. UAB understood this to be the case, because when it purported to make payments to TWP for streaming, based on revenues generated in some unknown manner using an undisclosed "Qualified Listens" formula, it did so using the 25% rate specified in Section II(1)(b), not the 10% rate applicable to "sales" and "rentals" identified in Section II(1)(a). JA 39, 119, 126. In other words, UAB treated subscription service streams as "internet downloads."[7]

---

[7] UAB also treated digital streams as "units" on the royalty statements TWP received. JA 113-126.

But a stream is demonstrably not an "internet download."  *See* Barb

Gonzalez, *The Difference Between Streaming and Downloading Media*, Lifewire

(Mar. 25, 2022), https://www.lifewire.com/difference-between-streaming-and-

downloading-media-1847372; (last visited on June 13, 2024)[8]; *see also United*

*States v. Am. Soc'y of Composers, Authors & Publishers*, 627 F.3d 64, 74 (2d Cir.

2010) (distinguishing between a stream and a download for purposes of

determining whether the latter is a "public performance" under the Copyright Act).

Indeed, UAB admitted to TWP that "Digital Downloads" and "Streaming

Royalties" were different.

> The difference between Digital Downloads and Streaming Royalties is
> that each single Digital Download is paid a royalty, whereas Streaming
> Royalties are calculated based on total Qualified Listens (the aggregate
> time users listen to the title) multiplied by a streaming rate.

JA 143-145.  UAB's inability to articulate coherently where subscription services

fit within Section II of the License Agreement highlights the contract's ambiguity.

Based on the foregoing, it is apparent that the District Court should not have

dismissed TWP's copyright infringement claims.  The License Agreement is, at

---

[8] Multiple courts have cited articles accessible at <lifewire.com> as authority for
various propositions, in appropriate circumstances. *See, e.g.*, *Gerrard v. Acara
Sols. Inc.*, Case No. 18-CV-1041V(F), 2019 WL 2647758, at *1 n.3 (W.D.N.Y.
Jun. 27, 2019), *report and recommendation rejected on other grounds*, 469 F.
Supp. 3d 96 (W.D.N.Y. 2020); *Hall v. Sargeant*, Case No. 9:18-CV-80748, 2019
U.S. Dist. LEXIS 50316, at *2-3 (S.D. Fl. Mar. 26, 2019); *Alex Is the Best LLC v.
Blu Prods., Inc.*, Civ. Act. No. 16-769-RGA, 2017 U.S. Dist. LEXIS182313, at
*19-20 (D. Del. Nov. 3, 2017).

best, ambiguous as to whether distribution of the TWP Works through a subscription service was within the scope of the rights granted. There is no dispute that such a service did not generate royalties for TWP on a per-unit or per-copy basis, and that whatever payments TWP received were calculated in a different way, based on "Qualified Listens." But the use of the term "royalties" in Section II – a term defined to mean payments based on "each copy of a work sold," *supra* at pp. 33-34 – establishes that per-unit or per-copy payments were required, and that distribution of the TWP Works through a service that did not generate per-unit or per-copy royalties exceeded the scope of the rights TWP granted. The District Court's reliance on other provisions of the contract as the basis for a contrary interpretation adopted as a matter of law was misplaced, inconsistent, and at odds with both New York principles of contract interpretation and federal copyright law policies concerning copyright transfers.

**C.    The District Court Ignored Relevant Contractual Provisions in Construing the License Agreement to <u>Permit Listeners to Access Excerpts of the TWP Works at No Charge</u>**

The third error in the District Court's analysis was its conclusion that the License Agreement unambiguously permitted Appellees to allow customers to access excerpts of the TWP Works without paying anything. The District Court reached this conclusion even though the grant of rights in Section I of the License Agreement was limited to "unabridged readings," JA 38, and the License

Agreement contained a specific provision (Section V) providing that "Promotional Materials" like "excerpts associated with or taken from the literary work" were to be used "solely in connection with the promotion and advertisement of the recorded work produced pursuant to this Agreement." JA 39.

The District Court concluded that the License Agreement grant was not exceeded when Appellees allowed listeners to access the TWP Works for less than five minutes at no charge, relying entirely on *Black's Law Dictionary* definitions of the terms "abridge" and "abridgement." JA 158-159 (defining "abridge" as "[t]o condense (as a book or other writing)" and "abridgement" as "[a] condensed version of a longer work"). The District Court then concluded that "the Complaint does not allege any facts to support the proposition that any of the Defendants produced versions of the [TWP] Works that were condensed or otherwise altered from the original in any way. The fact that a listener could choose to listen to less than the entire book, does not make the copy 'abridged' in violation of the [License] Agreement." JA 158-159.

There are two problems with both the District Court's analysis and the conclusion it reached. First, it is at best questionable whether reliance on *Black's Law Dictionary* definitions of the terms "abridge" and "abridged" was proper when the License Agreement used the term "unabridged," and that word is not generally used in a legal context, as evidenced by the fact that *Black's Law Dictionary* has

43

no definition for "unabridged." Other dictionaries that do define "unabridged" make clear that the word is synonymous with "entire" or "complete." *See* UNABRIDGED Synonyms: 33 Similar and Opposite Words | Merriam-Webster Thesaurus ("not shortened by leaving out some parts; not abridged") (last visited June 13, 2024);

https://www.britannica.com/dictionary/unabridged#:~:text=Britannica%20Dictionary%20definition%20of%20UNABRIDGED,unabridged%20reprint%20of%20a%20novel ("not shortened by leaving out some parts; not abridged") (last visited June 13, 2024). Section I of the License Agreement required not just that audiobook versions of the TWP Works be manufactured in their complete form, but that they be marketed, sold and distributed in their entirety as well. JA 38. When Appellees allowed consumers to access the TWP Works in a less than complete form, without charge, they exceeded the grant of rights in Section I.

The second problem with this portion of the District Court's analysis is that it failed to take into account, or even mention, Section V. That Section specifically limited the use of "excerpts" of the TWP Works, both in terms of duration ("not to exceed 7500 words") and purpose ("solely in connection with the promotion and advertisement of the recorded work"). Under the District Court's interpretation of the License Agreement, customers would be permitted to access excerpts of the TWP Works both without paying for them, and for purposes other than advertising

44

and promotion. That construction therefore vitiates the limitation in Section V on how excerpts are to be used and thereby violates a cardinal principle of New York contract interpretation law. *See Goodheart Clothing Co. v. Laura Goodman Enters.*, 962 F.2d 268, 272-73 (2d Cir. 1992) ("a court should interpret a contract in a way that ascribes meaning, if possible, to all of its terms") (cleaned up).

Indeed, by ignoring Section V, the District Court's interpretation would have permitted Appellees to grant consumers access to far more than 7,500 words of the TWP Works – even tens or hundreds of thousands of words – without charge. Such an absurd result cannot possibly be what the parties intended, for it would eviscerate TWP's rights as a copyright holder and deprive Ms. Woods of her livelihood. But, that is the result the District Court's interpretation plainly permitted. *See Mastrovincenzo v. City of New York*, 435 F.3d 78, 104 (2d Cir. 2006) (contracts should be interpreted to avoid absurd results); *Greenwich Capital Fin. Prods., Inc. v. Negrin*, 74 A.D.3d 413, 415, 903 N.Y.S.2d 346, 348 (1st Dep't 2010) (a court should construe a contract "in a manner that accords the words their fair and reasonable meaning and achieves a practical interpretation of the expressions of the parties. Put otherwise, a contract should not be interpreted to produce a result that is absurd, commercially unreasonable or contrary to the reasonable expectations of the parties.") (cleaned up).

\* \* \* \* \*

The bottom line is this: at the very least, there is ambiguity in the License Agreement as to whether Appellees' challenged exploitation of the copyrighted TWP Works was unauthorized, viewing that contract in the light most favorable to TWP, and recognizing the policy embodied in the U.S. Copyright Act that transfers of rights like exclusive licenses are to be weighed in favor of an author/grantor like TWP. As a result, the decision below cannot stand. TWP therefore should be permitted to assert and pursue its direct infringement claims against Appellees.

**D.     Upon Reversal of the Decision Below Dismissing TWP's Direct Copyright Infringement Claims Against Appellees, Its Secondary Infringement Claims, as Well as Its <u>Common Law Claims Against UAB, Should Be Reinstated</u>**

The same result should obtain as to TWP's claims for secondary infringement against UAB and Blackstone. The only ground for their dismissal was the dismissal of TWP's direct infringement claims, as there can be no secondary liability for copyright infringement unless there is direct infringement. JA 159-160; *see Spinelli*, 903 F.3d at 197 ("Without a showing of a direct copyright infringement, secondary liability cannot be maintained.") So just as this Court should reverse the dismissal of TWP's direct infringement claims, so too should it reverse the dismissal of TWP's secondary infringement claims.

Likewise, the Court should reverse the dismissal without prejudice of TWP's New York State claims against UAB for breach of the License Agreement and the

implied covenant of good faith and fair dealing inherent in it. The District Court held that TWP properly invoked subject matter jurisdiction over these claims when the action was filed under 28 U.S.C. § 1367(a), based on TWP's assertion of its federal copyright claims. JA 160. But, in light of the dismissal of those federal claims, the District Court declined to exercise subject matter jurisdiction over the New York claims. *Id.* Given that TWP's copyright claims should be reinstated following reversal of the decision below, its New York State claims should also be restored. *See Curry v. City of Syracuse*, 316 F.3d 324, 329, 337 (2d Cir. 2003) (reversing with-prejudice dismissal of federal claims and reinstating New York State claims dismissed without prejudice).

## **CONCLUSION**

For all of the foregoing reasons, plaintiff-appellant Teri Woods Publishing, LLC, respectfully submits that this Court should reverse the Order and Judgment entered below and remand this case for further proceedings.

Dated:    New York, New York
          June 20, 2024

DORSEY & WHITNEY LLP

By:  */s/ Bruce R. Ewing*      
Bruce R. Ewing
Daniel P. Goldberger
51 West 52nd Street
New York, New York 10019
(212) 415-9200

*Attorneys for Appellant*
*Teri Woods Publishing, LLC*

## <u>CERTIFICATE OF COMPLIANCE WITH RULE 32(a)</u>

*Certificate of Compliance with Type-Volume Limitation,*
*Typeface Requirements and Type Style Requirements*

1.      This brief contains 11,377 words, excluding the parts of the brief

exempted by Federal Rule of Appellate Procedure 32(f).

2.      This brief complies with the typeface requirements of Federal Rule of

Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of

Appellate Procedure 32(a)(6) because it has been prepared in a proportionally

spaced typeface using Microsoft Word 2016 in 14-point Times New Roman font.


Dated: June 20, 2024


<u>/s/ *Bruce R. Ewing*</u>
Bruce R. Ewing