# 24-1137

IN THE
UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

TERI WOODS PUBLISHING, LLC,

*Plaintiff-Appellant,*

v.

AMAZON.COM, INC., AUDIBLE, INC., BLACKSTONE AUDIO, INC. and
URBAN AUDIO BOOKS, LLC,

*Defendants-Appellees.*

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF NEW YORK
Hon. Dora L. Irizarry
Case No. 1:23-cv-00507**

**JOINT BRIEF FOR DEFENDANTS-APPELLEES**

Brian D. Buckley
Deena J.G. Feit
FENWICK & WEST LLP
401 Union Street, 5th Floor
Seattle, WA 98101
Telephone: 206.389.4510

Jedediah Wakefield
FENWICK & WEST LLP
555 California Street, 12th Floor
San Francisco, CA 94104
Telephone: 415.875.2300

*Attorneys for Defendants-Appellees
Amazon.com, Inc. and Audible, Inc.*

Craig J. Mariam
GORDON REES SCULLY
MANSUKHANI, LLP
633 West 5th Street
52nd Floor
Los Angeles, CA 90071
Telephone: 213.576.5000

*Attorneys for Defendant-Appellee*
*Blackstone Audio, Inc.*

Samuel P. Vitello
AKERMAN LLP
1251 Avenue of the Americas
38th Floor
New York, NY 10020
Telephone: 212.880.3800

Eric J. Gribbin
AKERMAN LLP
71 South Wacker Drive, 47th Floor
Chicago, IL 60606
Telephone: 312.634.5700

*Attorneys for Defendant-Appellee*
*Urban Audio Books, LLC*

## DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Defendant-Appellee Amazon.com, Inc., states that it has no parent corporation and no publicly held company owns 10% or more of its stock.

Defendant-Appellee Audible, Inc., states that it is a wholly owned subsidiary of Amazon.com, Inc.


Dated:  July 25, 2024     FENWICK & WEST LLP


          By:  */s/ Jedediah Wakefield*
             Jedediah Wakefield

          Attorneys for Defendants-Appellees
          AUDIBLE, INC., and AMAZON.COM, INC.

## DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Defendant-Appellee Blackstone Audio, Inc. states that it is a private non-governmental party and certifies, through its undersigned counsel, that it is not a subsidiary of any parent company and that no publicly held company owns 10% or more of its stock.


Dated: July 25, 2024     GORDON REES SCULLY
            MANSUKHANI, LLP


           By: */s/Craig J. Mariam*
             Craig J. Mariam

           Attorneys for Defendant-Appellee
           BLACKSTONE AUDIO, INC.

ii

## DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Defendant-Appellee Urban Audio Books, LLC states that it is a private non-governmental party, and it certifies, through its undersigned counsel, that it is not a subsidiary of any parent company and that no publicly held company owns 10% or more of its stock.

Dated: July 25, 2024                    AKERMAN LLP


                                        By: */s/ Eric J. Gribbin*
                                             Eric J. Gribbin

                                        Attorneys for Defendant-Appellee
                                        URBAN AUDIO BOOKS, LLC

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................1

STATEMENT OF THE ISSUES ..........................................5

STATEMENT OF THE CASE ............................................5

    I.    STATEMENT OF FACTS...........................................5

        A.    The License Agreement ......................................5

        B.    Distribution of the Licensed Works......................8

        C.    TWP's Communication With Defendants And
            Termination Of The Agreement...............................10

    II.    PROCEDURAL HISTORY .......................................11

        A.    Defendants' Motions to Dismiss...............................11

        B.    The District Court's Order Dismissing TWP's
            Complaint.......................................................12

SUMMARY OF THE ARGUMENT ....................................14

STANDARD OF REVIEW ................................................18

ARGUMENT ...................................................................19

    I.    THE DISTRICT COURT CORRECTLY DISMISSED
        TWP'S DIRECT COPYRIGHT INFRINGEMENT CLAIM. ..........19

        A.    The District Court Correctly Found That Defendants
            Acted Within The Scope Of The License.................20

            1.    TWP's Misleading Allegations About "Free"
                Distributions Fail To State A Claim For
                Copyright Infringement. ..................................23

            2.    TWP's "Per-Unit" Theory Does Not Support A
                Copyright Claim. ...........................................26

iv

# TABLE OF CONTENTS
## (Continued)

**Page**

        a.    No "Per-Unit" Payment Requirement Exists In The Agreement.......................................27

        b.    The Agreement's References To "Royalties" Do Not Create A "Per-Unit" Payment Requirement. ..........................................30

      3.    Subscription Streaming Services Fall Within The Agreement's Payment Provisions And The Scope Of The License.....................................................32

  B.    A Listener's Choice To Listen To Less Than An Entire Audiobook Does Not Create An "Abridged" Copy Or "Excerpt."..................................................................33

II.    THE DISTRICT COURT CORRECTLY DISMISSED TWP'S SECONDARY COPYRIGHT INFRINGEMENT AND STATE-LAW CLAIMS. ............................................35

CONCLUSION.........................................................................................36

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*10012 Holdings, Inc. v. Sentinel Ins.*,
  21 F.4th 216 (2d Cir. 2021) ........................................................27, 28

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)..........................................................................18

*Bartsch v. Metro-Goldwyn-Mayer, Inc.*,
  391 F.2d 150 (2d Cir. 1968) ...........................................................21

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007).....................................................................18, 19

*Boosey & Hawkes Music Publishers, Ltd. v. Walt Disney Co.*,
  145 F.3d 481 (2d Cir. 1998) .......................................................21, 32

*Burke v. PriceWaterHouseCoopers LLP Long Term Disability Plan*,
  572 F.3d 76 (2d Cir. 2009) ..............................................................27

*Cruden v. Bank of New York*,
  957 F.2d 961 (2d Cir. 1992) .............................................................27

*Davis v. Blige*,
  505 F.3d 90 (2d Cir. 2007) ...............................................................19

*Giunta v. Dingman*,
  893 F.3d 73 (2d Cir. 2018) ...............................................................18

*Glob. Reinsurance Corp. of Am. v. Century Indem. Co.*,
  22 F.4th 83 (2d Cir. 2021) ...............................................................27

*Graham v. James*,
  144 F.3d 229 (2d Cir. 1998) .....................................................19, 21, 22

*Great Minds v. Fedex Off. & Print Servs., Inc.*,
  886 F.3d 91 (2d Cir. 2018) ...............................................................27

## TABLE OF AUTHORITIES
### (Continued)

**Page(s)**

*Johnson v. Copyright Royalty Bd.*,
969 F.3d 363 (D.C. Cir. 2020) ............................................................30

*Lilly v. City of New York*,
934 F.3d 222 (2d Cir. 2019) ...............................................................27

*Loc. 377, RWDSU, UFCW v. 1864 Tenants Ass'n*,
533 F.3d 98 (2d Cir. 2008) .................................................................30

*Mirlis v. Greer*,
952 F.3d 51 (2d Cir. 2020) ...................................................................9

*Seiden Assocs., Inc. v. ANC Holdings, Inc.*,
959 F.2d 425 (2d Cir. 1992) ...............................................................27

*Smith v. Barnesandnoble.com, LLC*,
839 F.3d 163 (2d Cir. 2016) ...............................................................20

*Spinelli v. Nat'l Football League*,
903 F.3d 185 (2d Cir. 2018) ............................................22, 25, 26, 35

*U.S. Naval Inst. v. Charter Commc'ns, Inc.*,
936 F.2d 692 (2d Cir. 1991) ...............................................................19

*Yamashita v. Scholastic Inc.*,
936 F.3d 98 (2d Cir. 2019) .................................................................18

**STATUTES**

17 U.S.C. § 801(a)-(b)(1) .....................................................................30

28 U.S.C. § 1367(c)(3) .........................................................................36

**OTHER AUTHORITIES**

37 C.F.R. § 385.21(a)-(b) .....................................................................30

*American Heritage Dictionary* ............................................................31

*Black's Law Dictionary* ......................................................................34

Restatement (Second) of Contracts § 224 (1981) ................................22

## TABLE OF AUTHORITIES
### (Continued)

**Page(s)**

*Royalty*, The American Heritage Dictionary,
   https://www.ahdictionary.com/word/search.html?q=royalty
   (last visited July 25, 2024) ...................................................................... 31

*Royalty*, Collins,
   https://www.collinsdictionary.com/dictionary/english/royalty
   (last visited July 25, 2024) ...................................................................... 31

## INTRODUCTION

Teri Woods Publishing, LLC ("TWP") publishes and distributes books written by Teri Woods and other authors. Hoping to reach the audiobook market, TWP entered a license agreement (the "Agreement") with Urban Audio Books, LLC ("UAB") that allowed UAB to publish audio versions of certain TWP books. The Agreement granted UAB expansive rights, allowing it to manufacture, market, sell, and distribute TWP audiobooks "in all markets" through any means "capable of emitting sounds derived from the recording of audiobooks" without restriction. As consideration for the broad license UAB received, the Agreement required UAB to pay a percentage of its net receipts from TWP audiobooks, including from wholesale and catalog sales. Exercising its rights under the Agreement, UAB granted a sublicense to Blackstone Audio, Inc., which in turn granted a sublicense to Audible, Inc., allowing Audible and Amazon.com, Inc. to market and distribute TWP audiobooks.

Apparently unhappy with the payments it received from UAB, TWP brought this lawsuit. But in addition to suing UAB for allegedly breaching the Agreement, TWP asserted copyright infringement claims against not only UAB but also Blackstone, Audible, and Amazon, even though they distributed TWP audiobooks exactly as the Agreement permitted.

1

It is well-settled that licensees of copyrighted works cannot be liable for infringing the rights assigned to them. Attempting to overcome that rule, TWP relied on strained arguments to assert that Defendants had exceeded the scope of the license. The district court correctly rejected each of TWP's arguments and dismissed TWP's Complaint. The court concluded that Defendants had acted within the broad scope of the license and that TWP's claims—which ultimately concerned royalties it received—sounded only in contract and did not create any viable copyright claims.

First, the district court rejected TWP's argument that the Agreement prohibited distribution through subscription streaming services. The court noted that the Agreement's broad grant of distribution rights through downloads and "other contrivances, appliances, mediums and means (now known and hereafter developed)" would plainly include streaming, and "there is no reasonable reading of that phrase that might exclude it."

Second, the district court rejected TWP's argument that the Agreement included a "per-unit" royalty requirement. Instead, the Agreement provided for a share of UAB's "net receipts," which were based on the "cash proceeds" *UAB* received—including from wholesale and catalog sales—not the number of copies or "units" *listeners* ultimately received.

Third, the district court rejected TWP's baseless assertion that Defendants distributed "abridged" copies when a listener chose to listen to less than an entire audiobook. As the district court explained, TWP alleged no "facts to support the proposition that any of the Defendants produced versions of TWP's works that were condensed or otherwise altered from the original in any way."

On appeal, TWP attempts to repackage the same baseless theories. It complains that Defendants supposedly exceeded their license rights by distributing TWP works for "free" as part of subscription services. In fact, new Audible customers can sign up for a free trial membership in which they receive one or two credits for audiobooks—from virtually *any* author—after which they must pay for the Audible service. And in all events, the Agreement did not restrict how downstream licensees like Blackstone or Audible could distribute or charge for audiobooks. Nor would it have made sense to do so, since TWP did not get paid based on those downstream sales. Instead, the Agreement provided for TWP to receive a percentage of *UAB's* net receipts from *its* catalog, wholesale, and other retail sales and rentals.

Next, attempting to salvage its "per-unit" claim, TWP makes a new argument on appeal that the Agreement's reference to "royalties" means that payments must be calculated on a per-unit basis, because (according to TWP) royalties—by definition—can be calculated only on a per-unit basis. But that argument finds no

support in copyright law or common sense; royalties can be calculated on whatever basis agreed to by the parties. Here, the Agreement was clear that TWP was entitled only to a percentage of UAB's net receipts, including for "catalog" sales, which obviously are not licensed on a "per-unit" basis. And any dispute about whether UAB paid the appropriate percentage of its net receipts is, at most, a contractual matter, not a copyright claim.

Finally, TWP attempts to resuscitate its argument that Defendants distributed "abridged" audiobooks or "excerpts" because customers could choose not to finish them. But TWP points to no allegations in its Complaint that any Defendant distributed a condensed version of any TWP work. As the district court correctly noted, and basic logic dictates, the fact that a listener could choose to listen to less than the entire book does not mean that Defendants were distributing "abridged" audiobooks or "excerpts." Ultimately, TWP's argument about abridged or excerpted books is just another complaint about how TWP was paid and is—once again—at most a contract claim.

TWP may regret the broad license it granted, and it may take issue with the payments it received, but the Agreement makes clear that TWP has no copyright case. As the district court correctly found, Defendants' actions were unquestionably within the scope of that broad Agreement, dooming TWP's copyright claims. The district court got it exactly right, and this Court should affirm.

4

## STATEMENT OF THE ISSUES

1.    Whether the district court correctly held that Defendants' distribution of the audiobooks fell within the scope of the license, barring TWP's copyright claims, when the Agreement contained no "per-unit" licensing requirement, no prohibition on subscription services, and no prohibition on downstream retailers offering free trial memberships in those services.

2.    Whether the district court correctly held that Defendants did not distribute "abridged" or "excerpted" audiobooks when a customer chose to listen to less than an entire audiobook.

## STATEMENT OF THE CASE

### I.    STATEMENT OF FACTS

#### A.    The License Agreement

TWP is author Teri Woods' publishing company.  Joint Appendix ("A") A-12 ¶ 1.  Woods began selling books in 1998 when she printed her first title, *True to the Game*, and sold it to bookstores.  A-17-18 ¶ 19.  That title eventually became a movie, and Woods' two sequels to *True to the Game* made the *New York Times* Best Sellers list.  A-18 ¶¶ 20-21.  Woods formed TWP in 2002 to publish her and others' works.  A-18 ¶ 22.  Through TWP, Woods has published 20 titles.  *Id*.

On December 19, 2018, TWP entered into the Agreement with UAB for audio publishing rights to 20 TWP titles (the "Licensed Works").  A-19 ¶ 25; A-38 § I.

Section I of the Agreement granted UAB expansive rights: "unabridged audio publishing rights to manufacture, market, sell and distribute copies throughout the World, and in all markets, copies of unabridged readings" of the Licensed Works "on cassette, CD, MP3-CD, pre-loaded devices, as Internet downloads and on, and in, *other contrivances, appliances, mediums and means (now known and hereafter developed)* which are capable of emitting sounds derived from the recording of audiobooks." A-38 § I (emphasis added). The licensed rights did not limit the "contrivances, appliances, mediums and means" through which the Licensed Works were distributed other than that they were "capable of emitting sounds derived from the recording of audiobooks." *Id.*

Section II of the Agreement provided the provisions through which UAB would pay TWP for distribution of the Licensed Works. A-39 § II. The payment terms were not part of the grant of distribution rights, nor was the license conditioned on them. Instead, the Agreement described the payment obligations as "consideration for the aforementioned rights and license granted." *Id.* Under Section II, UAB was to pay TWP a percentage of UAB's "net receipts," which are "defined as the actual cash proceeds received by" UAB, net of certain items such as returns, discounts, and sales taxes. *Id.* As applicable here, "net receipts" included (1) ten percent "of Licensee's net receipts from catalog, wholesale and other retail sales and rentals of the audio recordings of said literary work"; or (2) twenty-five

6

percent "of net receipts on all internet downloads of said literary work." A-39 § II(1)(a)-(b). The Agreement also specified that TWP would receive 25% "of net receipts" on certain "Playaway format sales." *Id.* § II(1)(c). Playaway is an unrelated company, and it is undisputed that Playaway format sales are not involved here. Dkt. 27-1 at 7; Dkt. 35 at 11; A-149 n.2. The Agreement further provides that "[n]o royalty shall be payable on copies supplied gratis for review, advertising sample or like purposes." A-39 § II(2).

Importantly, although TWP claims that "UAB agreed to pay TWP royalties on a per-unit basis," A-19 ¶ 26, the term "per-unit" appears nowhere in the Agreement, and the Agreement contains no requirement that UAB pay TWP based on individual "units" sold. A-38-41. Rather, TWP's payments were based on UAB's "net receipts," or the "actual proceeds" UAB received, including from "catalog" or "wholesale" sales. A-39 § II. In fact, the only reference to payment for sales of a "unit" appears in the royalty provision for Playaway format sales, which the parties agree does not apply here. *Id.*

The Agreement included an "Assignability" provision, providing that UAB "shall have the right to assign this Agreement and any or all of the rights granted to it hereunder to, and to sublicense to, any other person, [or] firm." A-40 § XI(3). Under that provision, UAB granted Blackstone rights to distribute and sell the

Licensed Works. A-22 ¶ 35. Blackstone, in turn, granted Audible and Amazon rights to distribute the Licensed Works. A-22-23 ¶ 36.

### B. Distribution of the Licensed Works

Following execution of the Agreement, UAB, Blackstone, and Audible distributed the Licensed Works, just as the Agreement envisioned. A-21-23 ¶¶ 30-36. Although UAB and Blackstone both granted distribution rights, all three companies offer their own retail membership plans for a monthly subscription price. A-23-24, 26 ¶¶ 39-40, 48-50. Under those plans, members can receive one or more "credits" per month that they can use to acquire audiobooks. *Id.* Audible separately gives members access to a catalog of titles in "Audible Plus" where members can listen to any title from that catalog as part of their subscription—in much the same way that Netflix customers stream movies for a fixed monthly fee—rather than paying for each title separately. A-23 ¶ 39.

TWP alleges that Audible decided "to distribute the TWP Works for 'free' to Audible members … at least in part because Amazon and Audible saw the opportunity to promote their flagship streaming service using the TWP Works." A-24 ¶ 41. This allegation suggests that Audible somehow targeted TWP works to provide for free. In fact—as TWP's exhibits make clear—new Audible customers can listen to virtually *any* title on Audible as part of a free trial. A-45-46. As TWP's exhibits show, *every* title (regardless of author) displayed under the headings

8

"People who viewed this also viewed" and "Related to this topic" includes the "$0.00 Free with Audible trial" promotional offer. *Id*. And Audible's home page, attached to TWP's opposition to Defendants' motions to dismiss, makes clear that this option is available for virtually any Audible title, including from authors like Stephen King and J.K. Rowling and celebrities like Prince Harry and Matthew McConaughey. A-141.[1] Of course, that any single audiobook can be listened to as part of a free trial does not mean there is unlimited free distribution of that audiobook or that TWP was not paid for such listens. And, as addressed below, TWP makes no allegation that *Audible* did not pay for all distribution rights it received, no matter how Audible charged its listeners.

As for titles Audible members can stream from a catalog without purchasing individual audiobooks, TWP misleadingly alleges that it "should have received millions of dollars in license revenue," A-13 ¶ 3—apparently believing it should have received a dollar per *minute* of listening. Under this theory, TWP would be entitled to hundreds of dollars every time a customer listened to a single audiobook, which typically last 8-12 *hours*. UAB explained to TWP that for "Digital Streaming," the "Units Sold" category on UAB's accounting statements contains the "*total minutes consumed*," A-145 (emphasis added), while for digital downloads,

---

[1] The Court can take judicial notice of publicly available websites. *See Mirlis v. Greer*, 952 F.3d 51, 63 n.11 (2d Cir. 2020).

9

"[e]very single download is calculated as one download unit," A-144-145. Rather than acknowledge this distinction, TWP repeatedly compares the payment it received per *minute* of listening to what it believes it should have received per *title*. *See* A-14-15, A-21-22, A-24-25, A-27 ¶¶ 7, 9, 32, 42, 44, 52. And TWP's allegations make clear that it did receive payments for subscription-based distributions and that its disagreement was with the amount. A-25 ¶ 44.

### C. TWP's Communication With Defendants And Termination Of The Agreement

About three years after entering the Agreement, on January 19, 2022, TWP emailed Audible, claiming that "Audible's sale, use, and distribution of [TWP's] audiobooks exceed the rights granted under [TWP's] license with [UAB], and as such Audible may be infringing [TWP's] copyrights by exploiting her works." A-27 ¶ 55 (second alteration added). Audible responded and noted (correctly) that TWP was in a dispute with its publisher. A-27-28 ¶ 56. Rather than intervene in this third-party dispute, Audible referred TWP to Blackstone, Audible's licensor. *Id.* Following this exchange, UAB sent TWP a cease-and-desist letter, requesting that TWP refrain from contacting UAB's distributors or third parties about the Agreement in "an effort to damage UAB's distribution relationship(s)." A-28 ¶ 57.

On January 17, 2023, TWP's attorneys sent a letter to UAB, copying Blackstone and Audible, terminating the Agreement based on alleged "material breaches." A-30 ¶ 63; A-51-53.

## II.    PROCEDURAL HISTORY

On January 24, 2023, TWP filed its Complaint, asserting claims of breach of contract and breach of the implied covenant of good faith and fair dealing against UAB, and copyright infringement claims against UAB, Blackstone, and Audible. A-12-36.  TWP alleged that UAB did not pay "the royalties to which [TWP] was entitled under the contract" and that all Defendants "have been giving away TWP's works for free to premium subscribers of their audiobook streaming and digital download services … in violation of the License Agreement" and "without properly compensating TWP."  A-13 ¶ 2.  Without citing any provision of the Agreement, TWP repeatedly alleged that the Agreement required it to be paid on a "per-unit basis."  A-12, A-19-20, A-25, A-30, ¶¶ 1, 26, 44, 68.  TWP also alleged that "by excluding listens to TWP Works lasting fewer than five minutes," Defendants distributed "abridged" copies of its works, which TWP claimed violated the scope of the Agreement.  A-25-26 ¶ 45.

### A.    Defendants' Motions to Dismiss

On April 7, 2023, Defendants moved to dismiss TWP's Complaint under Federal Rule of Civil Procedure 12(b)(6).  A-54, A-56; Dkt. 27-1; Dkt. 29-27. Defendants explained that they had acted within the scope of the broad license TWP granted, and therefore TWP could not bring copyright claims against them. Dkt. 27-1 at 5-7; Dkt. 29-27 at 6-7.  Defendants maintained that TWP's claims

amounted to, at most, a disagreement over how it was paid under the Agreement, and that the law did not permit TWP to dress up contract claims as a copyright case. Dkt. 27-1 at 5, 7-9; Dkt. 29-27 at 7-8. As to TWP's allegation that Audible distributed "abridged" audiobooks when listeners listened to an audiobook for less than five minutes, Defendants argued that TWP confused *distributing* an "abridged" audiobook (one with parts omitted) with a customer not *listening* to a full audiobook. Dkt. 37 at 6; *see also* Dkt. 38 at 3-4. Defendants also argued that, to the extent TWP alleged it did not receive payment for listens shorter than five minutes, that once again was an improperly packaged royalty dispute, not a copyright claim. Dkt. 37 at 9; Dkt. 29-27 at 7.

## B.   The District Court's Order Dismissing TWP's Complaint

On March 30, 2024, the district court granted Defendants' motions to dismiss TWP's copyright claims with prejudice. A-146-161. The court first found that the phrase "'other contrivances, appliances, mediums and means (now known and hereafter developed)' includes streaming technology and there is no reasonable reading of that phrase that might exclude it." A-155 (quoting A-38 § I). The court explained that "[t]here is no dispute that audio streaming via the internet was a technology in use at the time of the Agreement" and therefore was "encompassed in Section I of the Agreement." *Id.* In reaching this conclusion, the court rejected TWP's argument that the Agreement's payment section prohibits streaming services

because, according to TWP, streaming revenue did not fit into one of Section II's subsections. A-156. The court held that it was unnecessary "to decide how Plaintiff should be compensated for digital streams under the Royalties Section because the copyright claims must be dismissed based on the Court's finding that distribution of the Licensed Works on Defendants' subscription streaming platforms was, in fact, within the scope of the Agreement." A-156.

The court also rejected TWP's argument that the Agreement required UAB to pay TWP on a per-unit basis, finding "no such promise exists in the Agreement." A-157-158. Rather, the "only mention in the Agreement of requiring payment on a per unit basis is in clause II(1)(c) dealing with Playaway format sales," which the parties agreed did not apply here. A-157. And "[t]he omission of such terminology in reference to other revenue channels, or in the definition of net receipts, indicates that the parties intended no such requirement." A-157. Further, UAB's obligation "to maintain 'complete records which detail all sales, rentals, transactions, receipts, and expenses'" indicated that "the parties contemplated a broader range of revenue models than Plaintiff's per unit basis for compensation." A-157-158 (quoting A-39 § III). The court held that ultimately, TWP's arguments failed because they were "contrary to the plain meaning" of the Agreement's grant of rights and "the law of this Circuit." A-158.

13

Finally, the district court rejected TWP's argument that Defendants distributed the Licensed Works in an "abridged format." A-158-159. The district court explained that the Complaint alleged no facts "to support the proposition that any of the Defendants produced versions of the Licensed Works that were condensed or otherwise altered from the original in any way." A-159. And "[t]he fact that a listener could choose to listen to less than the entire book, does not make the copy 'abridged' in violation of the Agreement." A-159.

Based on its determination that Defendants did not exceed the scope of the Agreement's license, the court dismissed TWP's claims for secondary copyright infringement against UAB and Blackstone. A-159-160. The court declined to exercise supplemental jurisdiction over TWP's remaining state-law contract-based claims against UAB, dismissing those claims without prejudice. A-160-161.

## SUMMARY OF THE ARGUMENT

The district court correctly dismissed TWP's copyright claims. TWP does not dispute that the Agreement allows streaming, and TWP's disagreement over how much it was paid amounts to, at most, a contract dispute. The Court should affirm the district court's ruling.

**Defendants' Conduct Fell Within The Scope Of The License.** The Agreement granted broad, sublicensable rights to "manufacture, market, sell and distribute" the Licensed Works through any medium or means "capable of emitting

sounds derived from the recording of audiobooks." A-38 § I. Defendants did exactly that. Nothing in the Agreement prohibits distribution through subscriptions or streaming-based models. While TWP repeatedly asserts that Defendants "exceeded the scope of the rights TWP granted," it points to no unlicensed use of its works. Instead, TWP's claims go to how it was *paid* under the Agreement. Even as to those claims, TWP fails to identify a breach of any payment provision. And even if it could, the Agreement's payment provisions were separate from, and did not act as conditions on, the license grant. TWP's Complaint therefore failed to state a copyright claim.

**The License Did Not Prohibit Offering Free Trials.** TWP's objection that Defendants provided the Licensed Works "for free" fails to state a copyright claim, for several reasons. To begin with, the suggestion that Audible targeted *TWP's* works for "unlimited" free distribution—supposedly depriving Woods of the value of her life's work—is misleading. TWP's exhibits make clear that new Audible members can listen to a single audiobook—from *any* author—as part of a free trial, after which they must pay for membership plans. *See* A-45. More importantly, regardless of whether an Audible *listener* may have tried a TWP audiobook as part of a free trial, the Complaint contains no allegation that *Audible* did not pay Blackstone for all distribution rights it received or that Blackstone did not pay UAB such that TWP would have any claim against Audible, Amazon, or Blackstone.

TWP was entitled to payment based on UAB's "net receipts," not on each subsequent sale by downstream distributors.

In all events, even if UAB had failed to pay TWP appropriately, that would give rise to, at most, a contract claim against UAB, not a copyright claim against UAB and UAB's downstream licensees, Audible and Blackstone. The Agreement granted UAB broad distribution rights, which UAB could sublicense, and it specifically envisioned that UAB would provide "catalog" and "wholesale" distributions. A-39 § II. It imposed no restrictions on how downstream licensees ultimately charged their listeners for audiobooks and no prohibition on providing free trials. Moreover, the Agreement states that "[n]o royalty shall be payable on copies supplied gratis for review, advertising, sample or like purposes." A-39 § II(2). Accordingly, TWP's complaints about "free" copies fail to state a copyright claim.

**The License Did Not Require "Per Unit" Pricing.** There is no support for TWP's argument that the Licensed Works must be priced or paid for on a "per-unit" basis. The district court correctly found that "no such promise exists" in the Agreement. A-158. Rather, the Agreement provided for UAB to pay TWP based on UAB's "net receipts"—the amount of "actual cash proceeds" UAB received— with no restriction on the distribution or pricing models UAB or its sublicensees could use. A-39 § II. And even if the Agreement had required payment by UAB on

a per-unit basis (it did not), a violation of that provision would support only a contract claim.

Nor is there merit to TWP's argument that the Agreement's reference to "royalties" creates a "per-unit" payment argument. Aside from the fact that this new argument is forfeited, it is wrong. As copyright law (and common sense) makes clear, royalties are not confined to a per-unit fee, nor do they require per-unit pricing. And again, a royalty dispute would give rise only to a contract claim, not a copyright case.

**The License Did Not Prohibit Subscription Streaming Services.** Because there was no "per-unit" pricing requirement, there is no support for TWP's argument that Defendants violated copyrights by providing a streaming service in which listeners did not need to pay for each audiobook. Section I of the Agreement, which contained the license grant, allowed Defendants to distribute the Licensed Works through any "contrivances, appliances, mediums and means." A-38. The district court correctly found that "there is no reasonable reading" of Section I that would exclude "streaming." Indeed, TWP concedes that the Agreement permitted distribution through streaming services. Plaintiff-Appellant Brief ("PB") 32.

TWP instead claims that "streaming" through a *subscription* service is prohibited because it does not fall into Section II's payment provisions. In fact, Section II provides for payment of 10% of net receipts from "catalog, wholesale and

other retail sales or rentals"—which would cover streaming services.  A-39.  UAB's decision to pay TWP at the *higher* 25% rate applicable to Internet downloads shows only that UAB made a generous decision benefitting TWP, not that Defendants engaged in unlicensed distributions.

**Defendants Did Not Distribute "Abridged" Audiobooks.**  The district court correctly rejected TWP's argument that Defendants distributed "abridged" or "excerpted" copies of the Licensed Works when a customer listened to less than an entire audiobook.  A customer choosing not to finish an audiobook does not mean that Defendants were distributing altered, shortened, or condensed versions.  To the extent TWP disagrees with how it is paid for certain listens, that—yet again—would amount to a contract dispute, at most, not a copyright claim.

## STANDARD OF REVIEW

The Court reviews a district court's grant of a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) de novo, "accepting all of the complaint's factual allegations as true and drawing all reasonable inferences in the plaintiffs' favor." *Yamashita v. Scholastic Inc.*, 936 F.3d 98, 103-04 (2d Cir. 2019) (quoting *Giunta v. Dingman*, 893 F.3d 73, 79 (2d Cir. 2018)).  To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is properly

dismissed where, under applicable law, "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558.

## ARGUMENT

### I. THE DISTRICT COURT CORRECTLY DISMISSED TWP'S DIRECT COPYRIGHT INFRINGEMENT CLAIM.

Defendants distributed the Licensed Works pursuant to a valid license, and the district court therefore properly dismissed TWP's copyright claim. A valid license "immunizes the licensee from a charge of copyright infringement, provided that the licensee uses the copyright as agreed with the licensor." *Davis v. Blige*, 505 F.3d 90, 100 (2d Cir. 2007) (collecting cases). Accordingly, "an exclusive licensee of any of the rights comprised in the copyright, though it is capable of breaching the contractual obligations imposed on it by the license, cannot be liable for infringing the copyright rights conveyed to it." *U.S. Naval Inst. v. Charter Commc'ns, Inc.*, 936 F.2d 692, 695 (2d Cir. 1991); *see also Graham v. James*, 144 F.3d 229, 236 (2d Cir. 1998) (copyright owner who grants license "waives his right to sue the licensee for copyright infringement"). Thus, the question is not whether TWP was paid the amount to which it believes it was entitled but whether Defendants' distribution of the Licensed Works fell within the grant of rights in the Agreement.

Aware of this standard, TWP attempts to cloak its contractual dispute as a copyright claim, repeating the claim that Defendants "exceeded the scope of the rights they were granted." PB 1, 3; *see also id.* at 12, 17, 42. But simply uttering

that phrase does not make it true. TWP does not dispute that Defendants held valid licenses to distribute the Licensed Works, and it points to no conduct by Defendants that fell outside the scope of the broad licenses they received. As discussed below, contrary to TWP's arguments, the Agreement did not require Defendants to charge listeners separately for each audiobook on a "per-unit" basis. Nor did it prohibit Defendants from allowing customers to try an audiobook for free. TWP also fails to identify any allegation suggesting that Defendants distributed anything other than "unabridged" copies of the Licensed Works. Accordingly, TWP failed to allege that Defendants' conduct was unauthorized, and the district court correctly dismissed TWP's copyright claim.

## A. The District Court Correctly Found That Defendants Acted Within The Scope Of The License.

Defendants' distribution of the Licensed Works fell squarely within the Agreement's sweeping grant of rights. When "the existence of the license is undisputed, and the only contested issue is its scope, the copyright owner bears the burden of proving that the defendant's conduct was unauthorized under the license." *Smith v. Barnesandnoble.com, LLC*, 839 F.3d 163, 167 (2d Cir. 2016). "If the contract is more reasonably read to convey one meaning, the party benefitted by that reading should be able to rely on it; the party seeking exception or deviation from the meaning reasonably conveyed by the words of the contract should bear the burden of negotiating for language that would express the limitation or deviation."

*Boosey & Hawkes Music Publishers, Ltd. v. Walt Disney Co.*, 145 F.3d 481, 487 (2d Cir. 1998). Further, a licensee "may properly pursue any uses which may reasonably be said to fall within the medium as described in the license." *Id.* at 486 (quoting *Bartsch v. Metro-Goldwyn-Mayer, Inc.*, 391 F.2d 150, 155 (2d Cir. 1968)).

Here, the license grant, contained in Section I of the Agreement, is straightforward, unambiguous, and broad. It granted UAB exclusive rights to "manufacture, market, sell and distribute" audio versions of TWP works. A-38 § I. It contained no requirement that audiobooks be marketed, promoted, priced, or distributed in any particular way. It also contained no restriction on the means or method of distribution. To the contrary, it granted the right to distribute the works through any "mediums and means (now known and hereafter developed) which are capable of emitting sounds derived from the recording of audiobooks." *Id*.

Ignoring the expansive rights it granted in Section I of the Agreement, TWP scrambles to identify some violation of the *payment* provisions in Section II. PB 31-42. But nothing in the payment provisions of Section II restricts or acts as a condition on the broad license rights TWP granted. Whether a claim against a licensee is contractual or based on copyright "turns … on the distinction in contract between a condition and a covenant." *Graham*, 144 F.3d at 236. Breach of a condition may give rise to a copyright claim, while breach of a covenant leads only to a contract claim. *See id.* at 236-37. Conditions "must occur … *before*

performance under a contract becomes due." Restatement (Second) of Contracts § 224 (1981) (emphasis added). "Generally speaking, New York respects a presumption that terms of a contract are covenants rather than conditions." *Graham*, 144 F.3d at 237 (collecting cases). And where, as here, a licensor grants rights in exchange for receiving payments on use of the works, the payment terms generally constitute covenants, not conditions. *See id.* (treating royalty obligations as covenants); *see also Spinelli v. Nat'l Football League*, 903 F.3d 185, 202 (2d Cir. 2018) (complaint that a licensor "did not receive royalties … typically … sound[s] in contract").

The payment provisions in Section II were plainly not conditions of the grant of rights. Instead, they described how UAB would pay for rights *already granted* in Section I. Section II makes this point clear, reciting that payment is "consideration for the aforementioned rights and license *granted*." A-39 § II (emphasis added).

The facts here are in sharp contrast to the facts in *Spinelli v. National Football League*—a case on which TWP relies. PB 29-30. In *Spinelli*, the plaintiff stated an infringement claim *not* because the sublicense "trigger[ed] the agreements' royalty provisions," but because the defendant "*was prohibited from sublicensing* Plaintiffs' photographs in ways that would not qualify as 'Event Photo Sales.'" 903 F.3d at 202 (emphasis added). But *Spinelli* itself noted that a complaint that a licensor "did not receive royalties … typically … sound[s] in contract." *Id*.

22

Here, nothing in Section II restricts or conditions the rights in Section I to "manufacture, market, sell and distribute" audio versions of TWP works through any means "capable of emitting sounds derived from the recording of audiobooks," A-38. If TWP were somehow entitled to additional payments, it would be free to pursue them as a contractual matter, but its Complaint failed to state a copyright claim.

As discussed below, each of TWP's arguments fails under the plain language of the Agreement. And ultimately, TWP's arguments boil down to a claim that it was not paid what it was owed. Because those claims sound in contract, and not in copyright, that ends the inquiry.

### 1. TWP's Misleading Allegations About "Free" Distributions Fail To State A Claim For Copyright Infringement.

TWP's claim that Defendants exceeded the scope of their licenses by distributing the Licensed Works "for nothing" (PB 26-27) fails to state a copyright claim. To begin with, much of what TWP complains of as "free" is in fact a *paid* membership in a subscription plan, in which customers—for a monthly fee—receive credits that they can redeem for audiobooks. A-26-27 ¶¶ 46-53. The Complaint identifies no promotion of "free" titles by UAB or Blackstone. Instead, the only potentially "free" distributions come with free trial memberships in the Audible service. As TWP's exhibits make clear, new customers receive one or two credits— good for virtually any audiobook—for their first month of membership, after which

23

they must pay monthly fees. A-45. This, of course, is not unlimited "free distribution" of the Licensed Works, as TWP wrongly suggests. PB 28.

More to the point, that an Audible listener may have received an audiobook as part of a free trial does not mean that TWP was not paid royalties. Nowhere in its Complaint does TWP allege that UAB gave Blackstone its sublicense for free, or that Blackstone gave Audible its license for free. Nor does the Complaint allege that UAB did not pay TWP based on "net receipts"—just as the Agreement provided. Thus, TWP's inflammatory claim that it was deprived of the value of Woods' "life's work" (PB 2) is wholly unsupported.

Ultimately, TWP's "free" distributions claim, and its "per-unit" theory discussed below, rest on a false assumption that TWP was entitled to a payment for each downstream distribution by retailers. But that is simply not what the Agreement says. Instead, as full consideration for all the license rights granted, the Agreement requires *UAB* to pay TWP a percentage of *UAB's* net receipts, including from "wholesale" sales. A-39 § II. Inherent in offering "wholesale" sales is that someone else—a downstream distributor like Audible—will engage in "retail" sales. But TWP is not owed royalties on those downstream sales; it is paid based on UAB's net receipts only. Accordingly, it makes sense that the Agreement imposes no requirements on how downstream licensees charge their listeners.

TWP also argues—contrary to logic—that Section II(2)'s provision that "[n]o royalty shall be payable on copies supplied gratis for review, advertising, sample or like purposes" means that free distribution of the Licensed Works to listeners was not authorized. PB 28. In fact, this provision is entirely consistent with the "net receipts" concept. TWP would receive a portion of UAB's net receipts from distribution of the Licensed Works (whether through membership plans or otherwise), but not when it provided free copies for certain purposes such as advertising or providing samples. A-39 § II(2). This is not an "extraordinary result" as TWP suggests (PB 28), but one that aligns with the Agreement that TWP negotiated.

The structure of the Agreement highlights why TWP's reliance on *Spinelli* is misplaced. PB 29-30. In *Spinelli*, plaintiffs were sports photographers who entered into "contributor agreements" with the Associated Press. 903 F.3d at 193. The contributor agreement provided that the AP would pay a royalty on "qualifying Event Photo Sales," which meant sales of licenses for photos "for which a per-image price is established." *Id.* at 194 (quoting contributor agreement). The photographer plaintiffs sued after the AP gave the NFL entities the right to use the photos for free through a complimentary license. *Id.* at 193, 195. The Court agreed with plaintiffs that the license did not permit the AP to sublicense plaintiff's photographs on

anything other than a per-image basis, and thus, the AP had acted beyond the scope of the license.  *Id*. at 201-02.

As the district court correctly concluded, the facts here contrast with *Spinelli*. A-156-157.  Unlike *Spinelli*, where the contributor agreements specifically provided for payments only on a "per-image price," 903 F.3d at 194, there is no requirement here that TWP be paid per individual sale.  A-39.  Instead, as discussed above, TWP is paid based on "the actual cash proceeds received by" UAB from "catalog, wholesale and other retail sales and rentals" and "internet downloads."  A-39. Nothing in those provisions or any other part of the Agreement requires a per-unit price.

In the end, TWP alleges that Defendants distributed the Licensed Works "*without properly compensating TWP*."  A-13 ¶ 2.  The Court in *Spinelli* was clear that a plaintiff cannot "proceed on a copyright infringement claim simply by repackaging a claim for royalties as a claim that the alleged infringer exceeded the scope of a licensing agreement."  903 F.3d at 202 n.7.  That is exactly what TWP attempts here.  If TWP believes it is owed a different amount than it received, then as the Court in *Spinelli* instructed, "the remedy is a contractual one."  *Id.*

### 2.     TWP's "Per-Unit" Theory Does Not Support A Copyright Claim.

TWP's next assertion, that the Agreement required royalty payments only "on a per-unit basis," fails to create a copyright claim.  That theory is entirely invented

and contrary to the Agreement's unambiguous language, and it would not support a copyright claim in any event.

### a. No "Per-Unit" Payment Requirement Exists In The Agreement.

"'[T]he first principle of contract interpretation' is that 'where the language of the contract is clear and unambiguous, the contract is to be given effect according to its terms.'" *Glob. Reinsurance Corp. of Am. v. Century Indem. Co.*, 22 F.4th 83, 94 (2d Cir. 2021) (quoting *Lilly v. City of New York*, 934 F.3d 222, 236 (2d Cir. 2019)). "[D]istinct terms must be given their own effect, and … the use of a term in one place but not the other is presumed to be intentional." *10012 Holdings, Inc. v. Sentinel Ins.,* 21 F.4th 216, 223 (2d Cir. 2021). Further, "[t]he language of a contract is not made ambiguous simply because the parties urge different interpretations." *Glob. Reinsurance*, 22 F.4th at 94 (quoting *Seiden Assocs., Inc. v. ANC Holdings, Inc.*, 959 F.2d 425, 428 (2d Cir. 1992)). Whether a contract is ambiguous "is a question of law for the court." *Great Minds v. Fedex Off. & Print Servs., Inc.*, 886 F.3d 91, 94 (2d Cir. 2018). A "court must not 'rewrite, under the guise of interpretation, a term of the contract when the term is clear and unambiguous.'" *Burke v. PriceWaterHouseCoopers LLP Long Term Disability Plan*, 572 F.3d 76, 81 (2d Cir. 2009) (quoting *Cruden v. Bank of New York*, 957 F.2d 961, 976 (2d Cir. 1992)).

27

Here, TWP claims that the Agreement required distribution "on a per-unit or per-copy basis," and therefore, Defendants could not "distribute the TWP Works via subscription services in which members either pay monthly fees to stream or otherwise access copyrighted works, or access such works through the redemption of credits." PB 31. TWP's "per-unit" requirement is a pure fabrication. As the district court correctly held, "no such promise exists" in the Agreement. A-158. The Agreement is unambiguous on this point, and TWP cannot manufacture an ambiguity by merely claiming that one exists. Nor can the Court rewrite the Agreement to create a provision TWP did not negotiate and now wishes were there.

The district court also correctly found that other sections of the Agreement support this unambiguous reading. The only place the word "unit" (not "per unit") appears in the Agreement is Section II(1)(c), which involves "Playaway format sales." A-39 § II(1)(c) (providing for 25% of "net receipts on Playaway format sales" when Playaway "pays a royalty to Licensee in respect of Playaway's sales of such unit"). The parties all agree that Playaway format sales do not apply here. Dkt. 27-1 at 7; Dkt. 35 at 11; A-149 n.2. And the fact that the Agreement specified when TWP should be paid based on sales of a unit emphasizes that the other payment provisions were *not* tied to sales of a specific "unit." *See 10012 Holdings*, 21 F.4th at 223.

TWP claims that the district court "placed undue emphasis on the presence of the word 'unit' in Section II(1)(c)" because the Playaway "unit" is a device, not an audiobook.  PB 36.  But this is beside the point; the district court correctly noted that the parties' decision to specify that net receipts are tied to a "unit" for one provision "indicates the parties intended no such requirement" in the other provisions.  A-157.

Similarly, the district court correctly noted that Section III's requirement that the licensee maintain "complete records which detail all sales, rentals, transactions, receipts, and expenses" supports the lack of any "per-unit" requirement.  A-157-158.  As the district court explained, if anything, "adding 'transactions' and 'receipts' to sales and rentals … indicates the parties contemplated a broader range of revenue models than Plaintiff's per unit basis for compensation."  A-157-158.  And as the district court correctly found, "[r]evenue from subscription fees for streaming logically would fit within the ambit of 'transactions' and/or 'receipts.'"  A-158.

TWP argues that if "transactions" included payments other than those on a "per-unit or per-copy basis" then Section II would have included the same term.  A-38-39.  But Sections II and III had different purposes: Section II dealt with payments based on net receipts, and Section III dealt with record keeping, which would support the calculation of those receipts.  A-39.  And TWP's suggestion that "transactions" could also include "sublicenses" (PB 37) does nothing to support its "per-unit" pricing theory.

### b. The Agreement's References To "Royalties" Do Not Create A "Per-Unit" Payment Requirement.

In an effort to salvage its failed "per unit" theory, TWP introduces a new argument: that "a 'royalty' is inherently a form of compensation that is calculated on a per-unit or per-copy basis when it comes to copyrighted works." PB 33-34. Because TWP did not raise this argument to the district court, TWP forfeited it, and the Court should therefore not consider it on appeal. *Loc. 377, RWDSU, UFCW v. 1864 Tenants Ass'n*, 533 F.3d 98, 99 (2d Cir. 2008).

In all events, TWP's new argument is wrong. Royalties for copyrighted works can take various forms, as the Copyright Act and federal regulations make clear. Under the Copyright Act, the Librarian of Congress appoints "3 full-time Copyright Royalty Judges" to "make determinations and adjustments of reasonable terms and rates *of royalty payments*" for certain distributions of works. *See* 17 U.S.C. § 801(a)-(b)(1) (emphasis added); *Johnson v. Copyright Royalty Bd.*, 969 F.3d 363, 368 (D.C. Cir. 2020). The "royalty payments" the Copyright Royalty Board sets are by no means limited to calculation on a "per-unit" or "per-copy" basis. Indeed, the Copyright Royalty Board sets one of the royalty rates that streaming services must pay for music as a percentage of the service provider's revenue, without requiring that streaming services charge "per unit" (as anyone with a Spotify or other streaming music subscription can attest). *See Johnson*, 969 F.3d at 367-369; 37 C.F.R. § 385.21(a)-(b).

TWP supports its "royalty" argument with parts of cherry-picked dictionary definitions, which provide an *example* of how a royalty might be determined on a per-copy basis. PB 34. Other definitions say nothing about "per copy" calculations. For example, *The American Heritage Dictionary* defines "royalty" as "a share paid to a writer or composer out of the proceeds resulting from the sale or performance of their work." *Royalty*, The American Heritage Dictionary, https://www.ahdictionary.com/word/search.html?q=royalty (last visited July 25, 2024). Similarly, the *Collins* dictionary states that royalties "are payments made to authors and musicians when their work is sold or performed. They usually receive a fixed *percentage of the profits* from these sales or performances." *Royalty*, Collins, https://www.collinsdictionary.com/dictionary/english/royalty (last visited July 25, 2024) (emphasis added). Those definitions align with how the parties defined the payment obligation here. The Agreement specified that UAB would pay TWP a percentage of UAB's "net receipts."

TWP may not like it now, but that is the deal it struck. The Court should reject TWP's improperly raised argument that the Agreement's references to "royalties" somehow imposes a "per-unit" payment requirement or narrows the scope of the license TWP granted.

### 3. Subscription Streaming Services Fall Within The Agreement's Payment Provisions And The Scope Of The License.

The district court correctly rejected TWP's argument that the Agreement did not permit distributions through subscription streaming services. Courts recognize that copyright licenses may continue to exercise their rights as new technologies develop. *See, e.g.*, *Boosey & Hawkes*, 145 F.3d at 485-87 (grant of rights in a 1939 agreement to use work in a "motion picture" applied to "new-use" case of video, even without an "express provision for 'future technologies'"). Here, as the district court noted, the Agreement's broad license to distribute not only through downloads, but also through "other contrivances, appliances, mediums and means (now known and hereafter developed)" would plainly include streaming, and "there is no reasonable reading of that phrase that might exclude it." A-155. And TWP does not argue otherwise. It admits in its brief that "*the issue is not whether Section I covered streaming,*" PB 32 (emphasis added).

TWP nevertheless faults the district court for not resolving whether UAB's receipts from *subscription* streaming services fell under Section II(1)(a)'s "net receipts from catalog, wholesale and other retail sales and rentals" or Section II(1)(b)'s "net receipts on all internet downloads." PB 39-40. Because the Agreement unambiguously allowed "streaming," the court did not need to address

what *payments* TWP should receive for distribution "through a subscription membership service," PB 32.

At a minimum, however, these services fall under the capacious "catalog, wholesale and other retail sales and rentals" (earning TWP 10% of net receipts). *See* A-39 § II. TWP suggests that "streaming" would refer to listens from a catalog of titles, and then claims that these listens do not constitute "internet downloads" because they are not downloaded. PB 40-41. Even if that were true, the fact that UAB decided to (over)pay TWP at the higher of two possible rates does not mean that the Agreement is ambiguous, let alone that it precluded streaming. Rather, given two options, both within the scope of the Agreement, UAB chose the more generous one.

In the end, any disagreement over how TWP was paid does not change the outcome: TWP has no copyright case. The district court correctly dismissed TWP's copyright infringement claims.

## B. A Listener's Choice To Listen To Less Than An Entire Audiobook Does Not Create An "Abridged" Copy Or "Excerpt."

The district court also correctly rejected TWP's argument that Defendants impermissibly distributed "abridged" copies or "excerpts" when customers listened to less than five minutes of an audiobook. PB 42-45. As the district court explained, the "Complaint does not allege any facts to support the proposition that any of the Defendants produced versions of the Licensed Works that were condensed or

otherwise altered from the original in any way.  The fact that a listener could choose to listen to less than the entire book, does not make the copy 'abridged' in violation of the Agreement."  A-158-159.

On appeal, the "problems" TWP identifies with the district court's reasoning do nothing to change that conclusion.  First, TWP claims the district court erred by relying on the definition of "abridge" and "abridgement" rather than a definition of "unabridged."  PB 43-44.  But TWP's definitions of "unabridged" include "not abridged."  PB 44.  TWP cannot articulate why relying on the *Black's Law Dictionary* definition of "abridge" as "[t]o condense" is "questionable," but TWP's preferred definitions of unabridged as "not shortened" somehow helps its case. PB 43-44.

Ultimately, TWP falls back on the same groundless argument that when Defendants "allowed customers to access the TWP Works in less than complete form, without charge, they exceeded the grant of rights in Section I."  PB 44.  Of course, the fact that a customer decides to stop listening to an audiobook does not mean Defendants distributed the audiobook "in less than complete form," PB 44. Further, to the extent TWP argues that members listened to TWP's works at "no charge" (PB 43), that is just another incarnation of its failed "per-unit" argument. And to the extent TWP claims it should have been paid even when customers

listened to only a short portion of an audiobook—with apologies for the repetition—that would support, at most, a contract claim.

Second, TWP asserts that the district court "failed to take into account, or even mention, Section V," which pertains to use of "excerpts" of 7,500 words or less. PB 44-45. According to TWP, "by ignoring Section V, the District Court's interpretation would have permitted Appellees to grant consumers access to far more than 7,500 words of the TWP Works—even tens or hundreds of thousands of words—without charge." PB 45. This argument fails for all the reasons discussed above. Defendants did not distribute "excerpts," whether the customer listened to one, ten, or one hundred minutes. Watching a few minutes of a movie or listening to few seconds of a song does not make it an "excerpt." Likewise, Defendants did not distribute "excerpts" when customers chose to listen to less than an entire audiobook. The Court should reject TWP's "excerpt" argument as well.

## II. THE DISTRICT COURT CORRECTLY DISMISSED TWP'S SECONDARY COPYRIGHT INFRINGEMENT AND STATE-LAW CLAIMS.

Because the district court correctly dismissed TWP's claim for direct copyright infringement, it also properly dismissed its claim for secondary infringement. *See Spinelli*, 903 F.3d at 197 (a plaintiff cannot maintain a secondary liability claim without "a showing of a direct copyright infringement"). Further, because TWP's direct copyright infringement claim fails, the district court correctly

declined to exercise supplemental jurisdiction over TWP's claims for breach of contract and breach of the implied covenant of good faith and fair dealing. 28 U.S.C. § 1367(c)(3) (a court "may decline to exercise supplemental jurisdiction over a claim" if "the district court has dismissed all claims over which it has original jurisdiction"); A-160-161. This case has always been, at most, a contract case, and the district court correctly dismissed the copyright claims with prejudice and dismissed the state-law claims without prejudice.

## CONCLUSION

For all these reasons, the Court should affirm the district court's judgment in all respects.

Dated: July 25, 2024    FENWICK & WEST LLP


By: */s/ Jedediah Wakefield*
  Jedediah Wakefield

Attorneys for Defendants-Appellees
AUDIBLE, INC., and AMAZON.COM, INC.

Dated: July 25, 2024    GORDON REES SCULLY
MANSUKHANI, LLP


By: */s/Craig J. Mariam*
  Craig J. Mariam

Attorneys for Defendant-Appellee
BLACKSTONE AUDIO, INC.

Dated:  July 25, 2024                   AKERMAN LLP


By:  */s/ Eric J. Gribbin*
     Eric J. Gribbin

Attorneys for Defendant-Appellee
URBAN AUDIO BOOKS, LLC

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitation of Federal Circuit Rule 32(a).  This brief contains 8,234 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Federal Circuit Rule 32(b).

2.      The brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Civil Procedure 32(a)(6).  The brief has been prepared in a proportionally spaced typeface using Microsoft Word, Version 23H2, in 14-point Times New Roman.

Dated:  July 25, 2024                    FENWICK & WEST LLP


                                         By: */s/ Jedediah Wakefield*
                                              Jedediah Wakefield

                                         Attorneys for Defendants-Appellees
                                         AUDIBLE, INC., and AMAZON.COM, INC.